# SMITH *v.* CALIFORNIA.

No. 9. Argued October 20, 1959.—Decided December 14, 1959.

148

*Stanley Fleishman* and *Sam Rosenwein* argued the cause and filed a brief for appellant.

*Roger Arnebergh* argued the cause for appellee. With him on the brief was *Philip E. Grey*.

*A. L. Wirin* and *Fred Okrand* filed a brief for the American Civil Liberties Union, as *amicus curiae,* urging reversal.

MR. JUSTICE. BRENNAN delivered the opinion of the Court.

Appellant, the proprietor of a bookstore, was convicted in a California Municipal Court under a Los Angeles City ordinance which makes it unlawful "for any person to have in his possession any obscene or indecent writing, [or] book . . . [i]n any place of business where . . . books . . . are sold or kept for sale." [1]  The offense was defined by the Municipal Court, and by the Appellate

---

[1] The ordinance is § 41.01.1 of the Municipal Code of the City of Los Angeles. It provides:

"INDECENT WRITINGS, ETC.—POSSESSION PROHIBITED:

"It shall be unlawful for any person to have in his possession any obscene or indecent writing, book, pamphlet, picture, photograph, drawing, figure, motion picture film, phonograph recording, wire recording or transcription of any kind in any of the following places:

"1. In any school, school-grounds, public park or playground or in any public place, grounds, street or way within 300 yards of any school, park or playground;

"2. In any place of business where ice-cream, soft drinks, candy, food, school supplies, magazines, books, pamphlets, papers, pictures or postcards are sold or kept for sale;

"3. In any toilet or restroom open to the public;

"4. In any poolroom or billiard parlor, or in any place where alcoholic liquor is sold or offered for sale to the public;

"5. In any place where phonograph records, photographs, motion pictures, or transcriptions of any kind are made, used, maintained, sold or exhibited." .

Department of the Superior Court,[2] which affirmed the Municipal Court judgment imposing a jail sentence on appellant, as consisting solely of the possession, in the appellant's bookstore, of a certain book found upon judicial investigation to be obscene. The definition included no element of scienter—knowledge by appellant of the contents of the book—and thus the ordinance was construed as imposing a "strict" or "absolute" criminal liability.[3] The appellant made timely objection below that if the ordinance were so construed it would be in conflict with the Constitution of the United States. This contention, together with other contentions based on the Constitution,[4] was rejected, and the case comes here on appeal. 28 U. S. C. § 1257 (2); 358 U. S. 926.

Almost 30 years ago, Chief Justice Hughes declared for this Court: "It is no longer open to doubt that the liberty of the press, and of speech, is within the liberty safeguarded by the due process clause of the Fourteenth

---

[2] In this sort of proceeding, "the highest court of a State in which a decision could be had." 28 U. S. C. § 1257. Cal. Const., Art. VI, §§ 4, 4b, 5. See *Edwards* v. *California*, 314 U. S. 160, 171.

[3] See Hall, General Principles of Criminal Law, p. 280. The Appellate Department's opinion is at 161 Cal. App. 2d Supp. 860, 327 P. 2d 636. The ordinance's elimination of scienter was, in fact, a reason assigned by that court for upholding it as permissible supplementary municipal legislation against the contention that the field was occupied by California Penal Code § 311, a state-wide obscenity statute which requires scienter.

[4] These other contentions, which are made again here, are that evidence of a nature constitutionally required to be allowed to be given for the defense as to the obscene character of a book was not permitted to be introduced; that a constitutionally impermissible standard of obscenity was applied by the trier of the facts; and that the book was not in fact obscene. In the light of our determination as to the constitutional permissibility of a strict liability law under the circumstances presented by this case, we need not pass on these questions. For the purposes of discussion, we shall assume without deciding that the book was correctly adjudged below to be obscene.

Amendment from invasion by state action. It was found impossible to conclude that this essential personal liberty of the citizen was left unprotected by the general guaranty of fundamental rights of person and property. . . ." *Near* v. *Minnesota,* 283 U. S. 697, 707. It is too familiar for citation that such has been the doctrine of this Court, in respect of these freedoms, ever since. And it also requires no elaboration that the free publication and dissemination of books and other forms of the printed word furnish very familiar applications of these constitutionally protected freedoms. It is of course no matter that the dissemination takes place under commercial auspices. See *Joseph Burstyn, Inc.,* v. *Wilson,* 343 U. S. 495; *Grosjean* v. *American Press Co.,* 297 U. S. 233. Certainly a retail bookseller plays a most significant role in the process of the distribution of books.

California here imposed a strict or absolute criminal responsibility on appellant not to have obscene books in his shop. "The existence of a *mens rea* is the rule of, rather than the exception to, the principles of Anglo-American criminal jurisprudence." *Dennis* v. *United States,* 341 U. S. 494, 500.[5] Still, it is doubtless competent for the States to create strict criminal liabilities by defining criminal offenses without any element of scienter—though even where no freedom-of-expression question is involved, there is precedent in this Court that this power is not without limitations. See *Lambert* v. *California,* 355 U. S. 225. But the question here is as to the validity of this ordinance's elimination of the scienter requirement—an elimination which may tend to work a substantial restriction on the freedom of speech and of the press. Our decisions furnish examples of legal devices and doctrines, in most applications consistent with the Constitu-

[5] See also Williams, Criminal Law—The General Part, p. 238 *et seq.*

tion, which cannot be applied in settings where they have the collateral effect of inhibiting the freedom of expression, by making the individual the more reluctant to exercise it. The States generally may regulate the allocation of the burden of proof in their courts, and it is a common procedural device to impose on a taxpayer the burden of proving his entitlement to exemptions from taxation, but where we conceived that this device was being applied in a manner tending to cause even a self-imposed restriction of free expression, we struck down its application. *Speiser* v. *Randall*, 357 U. S. 513. See *Near* v. *Minnesota, supra,* at 712–713. It has been stated here that the usual doctrines as to the separability of constitutional and unconstitutional applications of statutes may not apply where their effect is to leave standing a statute patently capable of many unconstitutional applications, threatening those who validly exercise their rights of free expression with the expense and inconvenience of criminal prosecution. *Thornhill* v. *Alabama*, 310 U. S. 88, 97–98. Cf. *Staub* v. *City of Baxley*, 355 U. S. 313.[6] And this Court has intimated that stricter standards of permissible statutory vagueness may be applied to a statute having a potentially inhibiting effect on speech; a man may the less be required to act at his peril here, because the free dissemination of ideas may be the loser. *Winters* v. *New York*, 333 U. S. 507, 509–510, 517–518. Very much to the point here, where the question is the elimination of the mental element in an offense, is this Court's holding in *Wieman* v. *Updegraff*, 344 U. S. 183. There an oath as to past freedom from membership in subversive organizations, exacted by a State as a qualification for public employment, was held to violate the Constitution in that it made no distinction between members who had, and those who had not, known of the organization's character. The

---

[6] See Note, 61 Harv. L. Rev. 1208.

Court said of the elimination of scienter in this context: "To thus inhibit individual freedom of movement is to stifle the flow of democratic expression and controversy at one of its chief sources." *Id.*, at 191.

These principles guide us to our decision here. We have held that obscene speech and writings are not protected by the constitutional guarantees of freedom of speech and the press. *Roth* v. *United States,* 354 U. S. 476.[7] The ordinance here in question, to be sure, only imposes criminal sanctions on a bookseller if in fact there is to be found in his shop an obscene book. But our holding in *Roth* does not recognize any state power to restrict the dissemination of books which are not obscene; and we think this ordinance's strict liability feature would tend seriously to have that effect, by penalizing booksellers, even though they had not the slightest notice of the character of the books they sold. The appellee and the court below analogize this strict liability penal ordinance to familiar forms of penal statutes which dispense with any element of knowledge on the part of the person charged, food and drug legislation being a principal example. We find the analogy instructive in our examination of the question before us. The usual rationale for such statutes is that the public interest in the purity of its food is so great as to warrant the imposition of the highest standard of care on distributors—in fact an absolute standard which will not hear the distributor's plea as to the amount of care he has used. Cf. *United States* v. *Balint,* 258 U. S. 250, 252–253, 254. His ignorance of the character of the food is irrelevant. There is no specific constitutional inhibition against making the distributors of food the strictest censors of their merchandise, but the constitutional guarantees of the freedom of speech and of the

---

[7] In the *Roth* opinion there was also decided *Alberts* v. *California,* which dealt with the power of the States in this area.

press stand in the way of imposing a similar requirement on the bookseller. By dispensing with any requirement of knowledge of the contents of the book on the part of the seller, the ordinance tends to. impose a severe limitation on the public's access to constitutionally protected matter. For ·if the bookseller is criminally liable without knowledge of the contents, and the ordinance fulfills its purpose,[8] he will tend to restrict the books he sells to those he has inspected; and thus the State will have imposed a restriction upon the distribution of constitutionally protected as well as obscene literature. It has been well observed of a statute construed as dispensing with any requirement of scienter that: "Every bookseller would be placed under an obligation to make himself aware of the contents of every book in his shop.· It would be altogether unreasonable to demand so near an approach to omniscience." [9] *The King* v. *Ewart*, 25 N. Z. L. R. 709, 729 (C. A.). And the bookseller's burden would become the public's burden, for by restricting him the public's access to reading matter would be restricted. If the contents of bookshops and periodical stands were restricted to material of which their proprietors had made an inspection, they might be depleted indeed. The bookseller's

---

[8] The effectiveness of absolute criminal liability laws in promoting caution has been subjected to criticism. See Hall, General Principles of Criminal Law, pp. 300–301. See generally Williams, Criminal Law—The General Part, pp. 267–274; Sayre, Public Welfare Offenses, 33 Col. L. Rev. 55; Mueller, On Common Law Mens Rea, 42 Minn. L. Rev. 1043; *Morissette* v. *United States*, 342 U. S. 246.

[9] Common-law prosecutions for the dissemination of obscene matter strictly adhered to the requirement of scienter. See the discussion in *Attorney General* v. *Simpson*, 93 Irish L. T. 33, 37–38 (Dist. Ct.). Cf. Obscene Publications Act, 1959, 7 & 8 Eliz. 2, c. 66, § 2 (5); American Law Institute Model Penal Code § 207.10 (7) (Tentative Draft No. 6, May 1957), and Comments, pp. 49–51.

The general California obscenity statute, Penal Code § 311, requires scienter, see note 3, and was of course sustained by us in *Roth* v. *United States*, *supra*. See note 7.

154

limitation in the amount of reading material with which he could familiarize himself, and his timidity in the face of his absolute criminal liability, thus would tend to restrict the public's access to forms of the printed word which the State could not constitutionally suppress directly. The bookseller's self-censorship, compelled by the State, would be a censorship affecting the whole public, hardly less virulent for being privately administered. Through it, the distribution of all books, both obscene and not obscene, would be impeded.

It is argued that unless the scienter requirement is dispensed with, regulation of the distribution of obscene material will be ineffective, as booksellers will falsely disclaim knowledge of their books' contents or falsely deny reason to suspect their obscenity. We might observe that it has been some time now since the law viewed itself as impotent to explore the actual state of a man's mind. See Pound, The Role of the Will in Law, 68 Harv. L. Rev. 1. Cf. *American Communications Assn.* v. *Douds,* 339 U. S. 382, 411. Eyewitness testimony of a bookseller's perusal of a book hardly need be a necessary element in proving his awareness of its contents. The circumstances may warrant the inference that he was aware of what a book contained, despite his denial.

We need not and most definitely do not pass today on what sort of mental element is requisite to a constitutionally permissible prosecution of a bookseller for carrying an obscene book in stock; whether honest mistake as to whether its contents in fact constituted obscenity need be an excuse; whether there might be circumstances under which the State constitutionally might require that a bookseller investigate further, or might put on him the burden of explaining why he did not, and what such circumstances might be. Doubtless any form of criminal obscenity statute applicable to a bookseller will induce some tendency to self-censorship and have some inhibi-

tory effect on the dissemination of material not obscene, but we consider today only one which goes to the extent of eliminating all mental elements from the crime.

We have said: "The fundamental freedoms of speech and press have contributed greatly to the development and well-being of our free society and are indispensable to its continued growth. Ceaseless vigilance is the watchword to prevent their erosion by Congress or by the States. The door barring federal and state intrusion into this area cannot be left ajar; it must be kept tightly closed and opened only the slightest crack necessary to prevent encroachment upon more important interests." *Roth* v. *United States, supra,* at 488.[10] This ordinance opens that door too far. The existence of the State's power to prevent the distribution of obscene matter does not mean that there can be no constitutional barrier to any form of practical exercise of that power. Cf. *Dean Milk Co.* v. *City of Madison,* 340 U. S. 349. It is plain to us that the ordinance in question, though aimed at obscene matter, has such a tendency to inhibit constitutionally protected expression that it cannot stand under the Constitution.

*Reversed.*

MR. JUSTICE BLACK, concurring.

The appellant was sentenced to prison for possessing in his bookstore an "obscene" book in violation of a Los Angeles city ordinance.[1] I concur in the judgment holding that ordinance unconstitutional, but not for the reasons given in the Court's opinion.

---

[10] We emphasized in *Roth,* at p. 484, that there is a "limited area" where such other interests prevail, and we listed representative decisions in note 14 at that page.

[1] As shown by Note 1 of the Court's opinion, the ordinance makes it unlawful to possess at places defined any obscene or indecent writing, book, pamphlet, picture, photograph, drawing, figure, motion picture film, phonograph recording, wire recording or transcription of any kind.

The Court invalidates the ordinance solely because it penalizes a bookseller for mere possession of an "obscene" book, even though he is unaware of its obscenity. The grounds on which the Court draws a constitutional distinction between a law that punishes possesssion of a book with knowledge of its "obscenity" and a law that punishes without such knowledge are not persuasive to me. Those grounds are that conviction of a bookseller for possession of an "obscene" book when he is unaware of its obscenity "will tend to restrict the books he sells to those he has inspected," and therefore "may tend to work a substantial restriction on freedom of speech." The fact is, of course, that prison sentences for possession of "obscene" books will seriously burden freedom of the press whether punishment is imposed with or without knowledge of the obscenity. The Court's opinion correctly points out how little extra burden will be imposed on prosecutors by requiring proof that a bookseller was aware of a book's contents when he possessed it. And if the Constitution's requirement of knowledge is so easily met, the result of this case is that one particular bookseller gains his freedom, but the way is left open for state censorship and punishment of all other booksellers by merely adding a few new words to old censorship laws. Our constitutional safeguards for speech and press therefore gain little. Their victory, if any, is a Pyrrhic one. Cf. *Beauharnais* v. *Illinois*, 343 U. S. 250, 267, at 275 (dissenting opinion).

That it is apparently intended to leave the way open for both federal and state governments to abridge speech and press (to the extent this Court approves) is also indicated by the following statements in the Court's opinion: " 'The door barring federal and state intrusion into this area [freedom of speech and press] cannot be left ajar; it must be kept tightly closed and opened only the slightest crack necessary to prevent encroachment upon more important interests.' . . . This ordinance opens that door too far."

This statement raises a number of questions for me. What are the "more important" interests for the protection of which constitutional freedom of speech and press must be given second place? What is the standard by which one can determine when abridgment of speech and press goes "too far" and when it is slight enough to be constitutionally allowable? Is this momentous decision to be left to a majority of this Court on a case-by-case basis? What express provision or provisions of the Constitution put freedom of speech and press in this precarious position of subordination and insecurity?

Certainly the First Amendment's language leaves no room for inference that abridgments of speech and press can be made just because they are slight. That Amendment provides, in simple words, that "Congress shall make no law . . . abridging the freedom of speech, or of the press." I read "no law . . . abridging" to mean *no law abridging.* The First Amendment, which is the supreme law of the land, has thus fixed its own value on freedom of speech and press by putting these freedoms wholly "beyond the reach" of *federal* power to abridge.[2] No

---

[2] Another concurring opinion has said that it would wrong James Madison and Thomas Jefferson to attribute to them the view that the First Amendment places speech wholly beyond the reach of the Federal Government. Of course, both men made many statements on the subject of freedom of speech and press during their long lives and no one can define their precise views with complete certainty. However, several statements by both Madison and Jefferson indicate that they may have held the view that the concurring opinion terms "doctrinaire absolutism."

James Madison, in exploring the sweep of the First Amendment's limitation on the Federal Government when he offered the Bill of Rights to Congress in 1789, is reported as having said, "[t]he right of freedom of speech is secured; the liberty of the press is expressly declared to be *beyond the reach of this Government* . . . ." (Emphasis supplied.) 1 Annals of Cong. 738. For reports of other discussions by Mr. Madison see pp. 424–449, 660, 704–756. Eleven years later he wrote: "Without tracing farther the evidence on this subject,

**158**

other provision of the Constitution purports to dilute the scope of these unequivocal commands of the First Amendment. Consequently, I do not believe that any federal agencies, including Congress and this Court, have power

it would seem scarcely possible to doubt that no power whatever over the press was supposed to be delegated by the Constitution, as it originally stood, and that the amendment was intended as a positive and absolute reservation of it." 6 Madison, Writings (Hunt ed. 1906), 341, 391, and see generally, 385–393, 399.

Thomas Jefferson's views of the breadth of the First Amendment's prohibition against abridgment of speech and press by the Federal Government are illustrated by the following statement he made in 1798: "[The First Amendment] thereby guard[s] in the same sentence, and under the same words, the freedom of religion, of speech, and of the press: insomuch, that whatever violates either, throws down the sanctuary which covers the others, and that libels, falsehood, and defamation, equally with heresy and false religion, are withheld from the cognizance of federal tribunals." 8 Jefferson, Writings (Ford ed. 1904), 464–465. For another early discussion of the scope of the First Amendment as a complete bar to all federal abridgment of speech and press see St. George Tucker's comments on the adequacy of state forums and state laws to grant all the protection needed against defamation and libel. 1 Blackstone, Commentaries (Tucker ed. 1803) 299.

Of course, neither Jefferson nor Madison faced the problem before the Court in this case, because it was not until the Fourteenth Amendment was passed that any of the prohibitions of the First Amendment were held applicable to the States. At the time Jefferson and Madison lived, before the Fourteenth Amendment was passed, the First Amendment did not prohibit the States from abridging free speech by the enactment of defamation or libel laws. Cf. *Barron* v. *Baltimore*, 7 Pet. 243. But the meaning of the First Amendment, as it was understood by two such renowned constitutional architects as Jefferson and Madison, is important in this case because of our prior cases holding that the Fourteenth Amendment applies the First, with all the force it brings to bear against the Federal Government, against the States. See, *e. g., West Virginia State Board of Education* v. *Barnette*, 319 U. S. 624, 639, and other cases collected in *Speiser* v. *Randall*, 357 U. S. 513, 530 (concurring opinion). But see *Beauharnais* v. *Illinois*, 343 U. S. 250, 288 (Court and dissenting opinions).

or authority to subordinate speech and press to what they think are "more important interests." The contrary notion is, in my judgment, court-made not Constitution-made.

State intrusion or abridgment of freedom of speech and press raises a different question, since the First Amendment by its terms refers only to laws passed by Congress. But I adhere to our prior decisions holding that the Fourteenth Amendment made the First applicable to the States. See cases collected in the concurring opinion in *Speiser* v. *Randall,* 357 U. S. 513, 530. It follows that I am for reversing this case because I believe that the Los Angeles ordinance sets up a censorship in violation of the First and Fourteenth Amendments.

If, as it seems, we are on the way to national censorship, I think it timely to suggest again that there are grave doubts in my mind as to the desirability or constitutionality of this Court's becoming a Supreme Board of Censors—reading books and viewing television performances to determine whether, if permitted, they might adversely affect the morals of the people throughout the many diversified local communities in this vast country.[3]

---

[3] *Kingsley International Pictures Corp.* v. *Regents of the University of New York,* 360 U. S. 684, 690–691 (concurring opinion). The views of a concurring opinion here, if accepted, would make this Court a still more inappropriate "Board of Censors" for the whole country. That opinion, conceding that "[t]here is no external measuring rod of obscenity," argues that the Constitution requires the issue of obscenity to be determined on the basis of "contemporary community standards"—"the literary, psychological or moral standards of a community." If, as argued in the concurring opinion, it violates the Federal Constitution for a local court to reject the evidence of "experts" on contemporary community standards of the vague word "obscenity," it seems odd to say that this Court should have the final word on what those community standards are or should be. I do not believe the words "liberty" and "due process" in the Fourteenth Amendment give this Court that much power.

It is true that the ordinance here is on its face only applicable to "obscene or indecent writing." It is also true that this particular kind of censorship is considered by many to be "the obnoxious thing in its mildest and least repulsive form . . . ." But "illegitimate and unconstitutional practices get their first footing in that way . . . . It is the duty of courts to be watchful for the constitutional rights of the citizen, and against any stealthy encroachments thereon." *Boyd* v. *United States,* 116 U. S. 616, 635. While it is "obscenity and indecency" before us today, the experience of mankind—both ancient and modern—shows that this type of elastic phrase can, and most likely will, be synonymous with the political and maybe with the religious unorthodoxy of tomorrow.

Censorship is the deadly enemy of freedom and progress. The plain language of the Constitution forbids it. I protest against the Judiciary giving it a foothold here.

MR. JUSTICE FRANKFURTER, concurring.

The appellant was convicted of violating the city ordinance of Los Angeles prohibiting possession of obscene books in a bookshop. His conviction was affirmed by the highest court of California to which he could appeal and it is the judgment of that court that we are asked to reverse. Appellant claims three grounds of invalidity under the Due Process Clause of the Fourteenth Amendment. He urges the invalidity of the ordinance as an abridgment of the freedom of speech which the guarantee of "liberty" of the Fourteenth Amendment safeguards against state action, and this for the reason that California law holds a bookseller criminally liable for possessing an obscene book, wholly apart from any scienter on his part regarding the book's obscenity. The second constitutional infirmity urged by appellant is the exclusion of appropriately offered testimony through duly qualified witnesses regarding the prevailing literary standards

and the literary and moral criteria by which books relevantly comparable to the book in controversy are deemed not obscene. This exclusion deprived the appellant, such is the claim, of important relevant testimony bearing on the issue of obscenity and therefore restricted him in making his defense. The appellant's ultimate contention is that the questioned book is not obscene and that a bookseller's possession of it could not be forbidden.

The Court does not reach, and neither do I, the issue of obscenity. The Court disposes of the case exclusively by sustaining the appellant's claim that the "liberty" protected by the Due Process Clause of the Fourteenth Amendment precludes a State from making the dissemination of obscene books an offense merely because a book in a bookshop is found to be obscene without some proof of the bookseller's knowledge touching the obscenity of its contents.

The Court accepts the settled principle of constitutional law that traffic in obscene literature may be outlawed as a crime. But it holds that one cannot be made amenable to such criminal outlawry unless he is chargeable with knowledge of the obscenity. Obviously the Court is not holding that a bookseller must familiarize himself with the contents of every book in his shop. No less obviously, the Court does not hold that a bookseller who insulates himself against knowledge about an offending book is thereby free to maintain an emporium for smut. How much or how little awareness that a book may be found to be obscene suffices to establish scienter, or what kind of evidence may satisfy the how much or the how little, the Court leaves for another day.

I am no friend of deciding a case beyond what the immediate controversy requires, particularly when the limits of constitutional power are at stake. On the other hand, a case before this Court is not just a case. Inevitably its disposition carries implications and gives direc-

tions beyond its particular facts. Were the Court holding that this kind of prosecution for obscenity requires proof of the guilty mind associated with the concept of crimes deemed infamous, that would be that and no further elucidation would be needed. But if the requirement of scienter in obscenity cases plays a role different from the normal role of *mens rea* in the definition of crime, a different problem confronts the Court. If, as I assume, the requirement of scienter in an obscenity prosecution like the one before us does not mean that the bookseller must have read the book or must substantially know its contents on the one hand, nor on the other that he can exculpate himself by studious avoidance of knowledge about its contents, then, I submit, invalidating an obscenity statute because a State dispenses altogether with the requirement of scienter does require some indication of the scope and quality of scienter that is required. It ought at least to be made clear, and not left for future litigation, that the Court's decision in its practical effect is not intended to nullify the conceded power of the State to prohibit booksellers from trafficking in obscene literature.

Of course there is an important difference in the scope of the power of a State to regulate what feeds the belly and what feeds the brain. The doctrine of *United States v. Balint,* 258 U. S. 250, has its appropriate limits. The rule that scienter is not required in prosecutions for so-called public welfare offenses is a limitation on the general principle that awareness of what one is doing is a prerequisite for the infliction of punishment. See *Morissette* v. *United States,* 342 U. S. 246. The balance that is struck between this vital principle and the overriding public menace inherent in the trafficking in noxious food and drugs cannot be carried over in balancing the vital role of free speech as against society's interest in dealing with pornography. On the other hand, the constitutional

protection of non-obscene speech cannot absorb the constitutional power of the States to deal with obscenity. It would certainly wrong them to attribute to Jefferson or Madison a doctrinaire absolutism that would bar legal restriction against obscenity as a denial of free speech.[1]

---

[1] The publication of obscene printed matter was clearly established as a common-law offense in England in 1727 by the case of *Rex* v. *Curl*, 2 Str. 788, which overruled *Reg.* v. *Read*, [1708] 11 Mod. 142, where it had been held that such offenses were exclusively within the jurisdiction of the ecclesiastical courts. See also *Rex* v. *Wilkes*, [1770] 4 Burr. 2527. The common-law liability was carried across the Atlantic before the United States was established and appears early in the States. In 1786, in New York, a copyright act specifically stated that "nothing in this Act shall . . . authorise any Person or Persons to . . . publish any Book . . . that may be profane, treasonable, defamatory, or injurious to Government, Morals or Religion." An Act to Promote Literature, Act of April 29, 1786, c. LIV, § IV, 1 Laws of New York (Jones and Varick) (1777–1789) 321. In Pennsylvania, in 1815, a prosecution was founded on common-law liability. *Commonwealth* v. *Sharpless*, 2 Serg. & Rawle, 91. And in Maryland, when a statute regulating obscene publications was enacted in 1853, it was recited that "although in the judgment of the Legislature, such advertisements and publications are contra bonos mores, and punishable by the common law, it is desirable that the common law in this regard be re-enacted and enforced; . . ." Act of May 16, 1853, Md. Laws 1853, c. 183.

Moreover, as early as the eleventh year of the reign of Queen Anne (1711–1712), well before the jurisdiction at common law emerged in England, Massachusetts enacted a statute which provided "[t]hat whosoever shall be convicted of composing, writing, printing or publishing, of any filthy obscene or prophane Song, Pamphlet . . . shall be punished . . . ." Acts of 1711–1712, c. I, Charter of the Province of the Massachusetts-Bay, p. 172 (1759). It is unclear whether the well-known prosecution in Massachusetts in 1821, *Commonwealth* v. *Holmes*, 17 Mass. *336, was founded on this statute or on common-law liability, although in 1945 the Supreme Judicial Court indicated that it regarded this early statute as having been in effect until a successor enactment of 1835, Revised Statutes of the Commonwealth of Massachusetts, c. 130, § 10 (1836). *Commonwealth* v. *Isenstadt*, 318 Mass. 543, 547, 62 N. E. 2d 840, 843, n. 1. See also Grant and Angoff, Massachusetts and Censorship, III, 10 B. U. L. Rev. 147

We have not yet been told that all laws against defamation and against inciting crime by speech, see *Fox* v. *Washington,* 236 U. S. 273 (1915), are unconstitutional as impermissible curbs upon unrestrictable utterance. We know this was not Jefferson's view, any more than it was the view of Holmes and Brandeis, JJ., the originating architects of our prevailing constitutional law protective of freedom of speech.

Accordingly, the proof of scienter that is required to make prosecutions for obscenity constitutional cannot be of a nature to nullify for all practical purposes the power of the State to deal with obscenity.  Out of regard for the State's interest, the Court suggests an unguiding, vague standard for establishing "awareness" by the bookseller of the contents of a challenged book in contradiction of his disclaimer of knowledge of its contents.  A bookseller may, of course, be well aware of the nature of a book and its appeal without having opened its cover, or, in any true sense, having knowledge of the book.  As a practical matter therefore the exercise of the constitutional right of a State to regulate obscenity will carry with it some hazard to the dissemination by a bookseller of non-obscene literature.  Such difficulties or hazards are inherent in many domains of the law for the simple reason that law cannot avail itself of factors ascertained quantitatively or even wholly impersonally.

The uncertainties pertaining to the scope of scienter requisite for an obscenity prosecution and the speculative proof that the issue is likely to entail, are considerations that reinforce the right of one charged with obscenity—a right implicit in the very nature of the legal concept of obscenity—to enlighten the judgment of the tribunal,

(1930).  Thereafter the offense was made statutory in other States. See, *e. g.,* Act of March 14, 1848, c. VIII, § 7 (1847–1848), Va. Laws 111; Act of May 16, 1853, c. 183 (1853), Laws of Maryland 212; Act of April 28, 1868, c. 430, 7 N. Y. Stat. at Large (1867–1870) 309.

be it the jury or as in this case the judge, regarding the prevailing literary and moral community standards and to do so through qualified experts. It is immaterial whether the basis of the exclusion of such testimony is irrelevance, or the incompetence of experts to testify to such matters. The two reasons coalesce, for community standards or the psychological or physiological consequences of questioned literature can as a matter of fact hardly be established except through experts. Therefore, to exclude such expert testimony is in effect to exclude as irrelevant evidence that goes to the very essence of the defense and therefore to the constitutional safeguards of due process. The determination of obscenity no doubt rests with judge or jury. Of course the testimony of experts would not displace judge or jury in determining the ultimate question whether the particular book is obscene, any more than the testimony of experts relating to the state of the art in patent suits determines the patentability of a controverted device.

There is no external measuring rod for obscenity. Neither, on the other hand, is its ascertainment a merely subjective reflection of the taste or moral outlook of individual jurors or individual judges. Since the law through its functionaries is "applying contemporary community standards" in determining what constitutes obscenity, *Roth* v. *United States,* 354 U. S. 476, 489, it surely must be deemed rational, and therefore relevant to the issue of obscenity, to allow light to be shed on what those "contemporary community standards" are. Their interpretation ought not to depend solely on the necessarily limited, hit-or-miss, subjective view of what they are believed to be by the individual juror or judge. It bears repetition that the determination of obscenity is for juror or judge not on the basis of his personal upbringing or restricted reflection or particular experience of life, but on the basis of "contemporary community standards." Can

it be doubted that there is a great difference in what is to be deemed obscene in 1959 compared with what was deemed obscene in 1859? The difference derives from a shift in community feeling regarding what is to be deemed prurient or not prurient by reason of the effects attributable to this or that particular writing. Changes in the intellectual and moral climate of society, in part doubtless due to the views and findings of specialists, afford shifting foundations for the attribution. What may well have been consonant "with mid-Victorian morals, does not seem to me to answer to the understanding and morality of the present time." *United States* v. *Kennerley,* 209 F. 119, 120. This was the view of Judge Learned Hand decades ago reflecting an atmosphere of propriety much closer to mid-Victorian days than is ours. Unless we disbelieve that the literary, psychological or moral standards of a community can be made fruitful and illuminating subjects of inquiry by those who give their life to such inquiries, it was violative of "due process" to exclude the constitutionally relevant evidence proffered in this case. The importance of this type of evidence in prosecutions for obscenity has been impressively attested by the recent debates in the House of Commons dealing with the insertion of such a provision in the enactment of the Obscene Publications Act, 1959, 7 & 8 Eliz. 2, Ch. 66 [2] (see 597 Parliamentary Debates, H. Comm., No. 36 (December

-----

[2] Section 4 of this Act provides:

"(1) A person shall not be convicted of an offense against . . . this Act . . . if it is proved that publication of the article in question is justified as being for the public good on the ground that it is in the interests of science, literature, art or learning, or of other objects of general concern.

"(2) It is hereby declared that the opinion of experts as to the literary, artistic, scientific or other merits of an article may be admitted in any proceedings under this Act either to establish or to negative the said ground."

16, 1958), cols. 1009–1010, 1042–1043; 604 Parliamentary Debates, H. Comm., No. 100 (April 24, 1959), col. 803), as well as by the most considered thinking on this subject in the proposed Model Penal Code of the American Law Institute. See A. L. I. Model Penal Code, Tentative Draft No. 6 (1957), § 207.10.[3] For the reasons I have indicated, I would make the right to introduce such evidence a requirement of due process in obscenity prosecutions.

MR. JUSTICE DOUGLAS, concurring.

I need not repeat here all I said in my dissent in *Roth* v. *United States,* 354 U. S. 476, 508, to underline my conviction that neither the author nor the distributor of this book can be punished under our Bill of Rights for publishing or distributing it. The notion that obscene publications or utterances were not included in free speech developed in this country much later than the adoption of the First Amendment, as the judicial and legislative

---

[3] Subsection (2) of this draft section provides in part:

". . . In any prosecution for an offense under this section evidence shall be admissible to show:

"(a) the character of the audience for which the material was designed or to which it was directed;

"(b) what the predominant appeal of the material would be for ordinary adults or a special audience, and what effect, if any, it would probably have on behavior of such people;

"(c) artistic, literary, scientific, educational or other merits of the material;

"(d) the degree of public acceptance of the material in this country;

"(e) appeal to prurient interest, or absence thereof, in advertising or other promotion of the material;

"Expert testimony and testimony of the author, creator or publisher relating to factors entering into the determination of the issue of obscenity shall be admissible."

developments in this country show.   Our leading author-
ities on the subject have summarized the matter as
follows:

> "In the United States before the Civil War there
> were few reported decisions involving obscene litera-
> ture.   This of course is no indication that such lit-
> erature was not in circulation at that time; the
> persistence of pornography is entirely too strong to
> warrant such an inference.   Nor is it an indication
> that the people of the time were totally indifferent to
> the proprieties of the literature they read.   In 1851
> Nathaniel Hawthorne's *The Scarlet Letter* was bit-
> terly attacked as an immoral book that degraded
> literature and encouraged social licentiousness.   The
> lack of cases merely means that the problem of
> obscene literature was not thought to be of sufficient
> importance to justify arousing the forces of the state
> to censorship."   Lockhart and McClure, Literature,
> The Law of Obscenity, and the Constitution, 38
> Minn. L. Rev. 295, 324–325.

Neither we nor legislatures have power, as I see it, to
weigh the values of speech or utterance against silence.
The only grounds for suppressing this book are very nar-
row.   I have read it; and while it is repulsive to me, its
publication or distribution can be constitutionally pun-
ished only on a showing not attempted here.   My view
was stated in the *Roth* case, at 514:

> "Freedom of expression can be suppressed if, and to
> the extent that, it is so closely brigaded with illegal
> action as to be an inseparable part of it.   *Giboney* v.
> *Empire Storage Co.*, 336 U. S. 490, 498; *Labor Board*
> v. *Virginia Power Co.*, 314 U. S. 469, 477–478.   As
> a people, we cannot afford to relax that standard.
> For the test that suppresses a cheap tract today can
> suppress a literary gem tomorrow.   All it need do is

to incite a lascivious thought or arouse a lustful desire. The list of books that judges or juries can place in that category is endless."

Yet my view is in the minority; and rather fluid tests of obscenity prevail which require judges to read condemned literature and pass judgment on it. This role of censor in which we find ourselves is not an edifying one. But since by the prevailing school of thought we must perform it, I see no harm, and perhaps some good, in the rule fashioned by the Court which requires a showing of *scienter*. For it recognizes implicitly that these First Amendment rights, by reason of the strict command in that Amendment—a command that carries over to the States by reason of the Due Process Clause of the Fourteenth Amendment—are preferred rights. What the Court does today may possibly provide some small degree of safeguard to booksellers by making those who patrol bookstalls proceed less highhandedly than has been their custom.*

MR. JUSTICE HARLAN, concurring in part and dissenting in part.

The striking down of local legislation is always serious business for this Court. In my opinion in the *Roth* case, 354 U. S., at 503–508, I expressed the view that state power in the obscenity field has a wider scope than federal power. The question whether *scienter* is a constitutionally required element in a criminal obscenity statute is

---

*See Chafee, Free Speech in the United States (1941), pp. 536–540; Lockhart and McClure, Literature, The Law of Obscenity, and the Constitution, 38 Minn. L. Rev. 295, 302–316; Daniels, The Censorship of Books (1954), p. 76 *et seq.;* Blanshard, The Right to Read (1955), p. 180 *et seq.;* Fellman, The Censorship of Books (1957). And see *New American Library of World Literature* v. *Allen,* 114 F. Supp. 823.

intimately related to the constitutional scope of the power to bar material as obscene, for the impact of such a requirement on effective prosecution may be one thing where the scope of the power to proscribe is broad and quite another where the scope is narrow. Proof of *scienter* may entail no great burden in the case of obviously obscene material; it may, however, become very difficult where the character of the material is more debatable. In my view then, the *scienter* question involves considerations of a different order depending on whether a state or a federal statute is involved. We have here a state ordinance, and on the meagre data before us I would not reach the question whether the absence of a *scienter* element renders the ordinance unconstitutional. I must say, however, that the generalities in the Court's opinion striking down the ordinance leave me unconvinced.

From the point of view of the free dissemination of constitutionally protected ideas, the Court invalidates the ordinance on the ground that its effect may be to induce booksellers to restrict their offerings of nonobscene literary merchandise through fear of prosecution for unwittingly having on their shelves an obscene publication. From the point of view of the State's interest in protecting its citizens against the dissemination of obscene material, the Court in effect says that proving the state of a man's mind is little more difficult than proving the state of his digestion, but also intimates that a relaxed standard of *mens rea* would satisfy constitutional requirements. This is for me too rough a balancing of the competing interests at stake. Such a balancing is unavoidably required in this kind of constitutional adjudication, notwithstanding that it arises in the domain of liberty of speech and press. A more critical appraisal of both sides of the constitutional balance, not possible on the meagre material before us,

seems to me required before the ordinance can be struck down on this ground. For, as the concurring opinions of my Brothers BLACK and FRANKFURTER show, the conclusion that this ordinance, but not one embodying some element of *scienter*, is likely to restrict the dissemination of legitimate literature seems more dialectical than real.

I am also not persuaded that the ordinance in question was unconstitutionally applied in this instance merely because of the state court's refusal to admit expert testimony. I agree with my Brother FRANKFURTER that the trier of an obscenity case must take into account "contemporary community standards," *Roth* v. *United States,* 354 U. S. 476, 489. This means that, regardless of the elements of the offense under state law, the Fourteenth Amendment does not permit a conviction such as was obtained here [1] unless the work complained of is found substantially to exceed the limits of candor set by contemporary community standards.[2] The community cannot, where liberty of speech and press are at issue, condemn that which it generally tolerates. This being so, it follows that due process—"using that term in its primary sense of an opportunity to be heard and to defend [a] . . . substantive right," *Brinkerhoff-Faris Co.* v. *Hill,* 281 U. S. 673, 678—requires a State to allow a liti-

---

[1] We are concerned in this instance with an objection to what a book portrays, not to what it teaches. Cf. *Kingsley Pictures Corp.* v. *Regents,* 360 U. S. 684.

[2] The most notable expression of this limitation is that of Judge Learned Hand, in *United States* v. *Kennerley,* 209 F. 119, 121: "'If there be no abstract definition, . . . should not the word 'obscene' be allowed to indicate the present critical point in the compromise between candor and shame at which the community may have arrived here and now?" See also the exposition of this view in American Law Institute, Model Penal Code (Tentative Draft No. 6), at p. 30. It may be that the *Roth* case embodies this restriction, see 354 U. S., at 487, n. 20; but see *id.,* at 499–500 (separate opinion).

gant in some manner to introduce proof on this score.
While a State is not debarred from regarding the trier of
fact as the embodiment of community standards, com-
petent to judge a challenged work against those stand-
ards,[3] it is not privileged to rebuff *all* efforts to enlighten
or persuade the trier.

However, I would not hold that any particular kind of
evidence must be admitted, specifically, that the Consti-
tution requires that oral opinion testimony by experts be
heard. There are other ways in which proof can be made,
as this very case demonstrates. Appellant attempted to
compare the contents of the work with that of other
allegedly similar publications which were openly pub-
lished, sold and purchased, and which received wide gen-
eral acceptance. Where there is a variety of means, even
though it may be considered that expert testimony is the
most convenient and practicable method of proof, I think
it is going too far to say that such a method is constitu-
tionally compelled, and that a State may not conclude,
for reasons responsive to its traditional doctrines of evi-
dence law, that the issue of community standards may
not be the subject of expert testimony. I know of no
case where this Court, on constitutional grounds, has
required a State to sanction a particular mode of proof.

In my opinion this conviction is fatally defective in that
the trial judge, as I read the record, turned aside *every*
attempt by appellant to introduce evidence bearing on
community standards. The exclusionary rulings were not
limited to offered expert testimony. This had the effect
of depriving appellant of the opportunity to offer any
proof on a constitutionally relevant issue. On this
ground I would reverse the judgment below, and remand
the case for a new trial.

---

[3] Such a view does not of course mean that the issue is to be tried
according to the personal standards of the judge or jury.