Burke, J.
(dissenting). If there was ever a statute that set forth its object in unmistakable language section 484-h of the Penal Law is it. A court, moreover, has seldom been favored with as complete a legislative history to guide its understanding as that present in this record. Nor will a glance at the hundreds of exhibits of magazines and books in the legislative committee reports (N. Y. Joint Legis. Committee Reports 1949-1963) leave us lacking in tangible evidence of the precise evil sought to be corrected by the Legislature. The companion case handed down this day, legitimizing the general sale of ‘ ‘ Fanny Hill ’ ’, the international archetype of banned pornography for over 200 years, only underscores the keenly felt necessity for legislation that will protect the young from books and magazines that ‘‘ loudly proclaim their dedication to coarse sensuality” (People v. Richmond County News, 9 N Y 2d 578, 580), without trenching on the right of the adult population to read and look at pretty much what they will. (See the discussion in Butler v. Michigan, 352 U. S. 380).
Yet we this day unblushingly inform the Legislature that we are not quite sure what it is talking about when, after 11 years of study, it decides to prohibit the sale to youngsters of material which “ exploits, is devoted to, or is principally made up of descriptions of illicit sex or sexual immorality”.* For this court to view this language, with the background of legislative history spread out on this record, as possibly reaching “ serious ” or “dignified” treatments of the subject of illicit sex can only be put down as a studied and cynical avoidance of a well-chartered legislative path. While we are reminded that the sword of vagueness is often used more out of “ antagonism to legislative policy rather than uncertainty concerning legislative meaning” (2 Sutherland, Statutory Construction [3d ed., 1943], § 4920, p. 447), I had not yet thought that the doctrine had become simply an infinitely plastic deus ex machina for the circumvention of legislative purpose without a formal denial of legislative power. After this display of self-induced *420 puzzlement, there is hardly a statute on the books that is proof against the resourcefulness of the judicial mind.
Transparent as the court’s use of notions of vagueness may be in this case, there remains an even more unusual deviation from established, and even routine, judicial practice—one as to which no justification is even attempted. If the court were genuinely puzzled and worried lest section 484-h carry within its sweep sociological and otherwise serious treatments and expressions of opinion on the subject of illicit sex, it could simply give the section a definitive construction, avoiding the possible overbroadness. Even granting an initial infirmity of vagueness, it can hardly be denied that the language will bear an interpretation limiting its applicability to material that “ exploits ”, “is devoted to ”, or “ is principally made up of ” — “descriptions of illicit sex”. Description is commonly defined as a detailed narrative or a mental picture (Century Dictionary; Webster’s New Int. Dictionary [2d ed.]). As applied to illicit sex, the meaning is unmistakable. A statute covering material that exploits, is devoted to or is principally made up of blow by blow narratives of illicitly sexual events leaves untouched all material which, when sold to children, could conceivably be held protected under the First Amendment. What possible justification is there for failing not only to attend to the hundreds of exhibits and the findings in the numerous legislative reports illustrating precisely what this statute forbids, but for failing to even mention in passing section 484-e which sets forth as law the legislative findings of the sort of thing found to impair the wholesome development of young people? I cannot understand how anyone after studying the reports of the Legislature and reading sections 484-e and 484-h could possibly conclude that they refer to the works of Shaw, Hawthorne, the Tristan and Isolde legend, or other literature containing references to illicit sex relationships, or advocating unconventional standards of behavior. It is plain that the law aims at books and magazines containing provocative pictures and writings that amount to “word pictures ’ ’ of illicit sex.
We are not commentators, critically reviewing for our audience defects in the draftsmanship of legislation. This court *421 is a branch of government, charged with the duty of interpreting and applying legislation to cases that come before us. If, therefore, in the course of this duty questions of interpretation arise requiring us to mark off the bounds within which legislation may constitutionally operate, we may not simply note the difficulty and walk away. To leave legislation uninterpreted and hence invalid—when there is a constitutionally permissible construction—is to fail in one of the highest duties a court is called upon to perform. As Mr. Justice Holmes said in United States v. Jin Fuey Moy (241 U. S. 394, 401): “A statute must be construed, if fairly possible, so as to avoid not only the conclusion that it is unconstitutional but also grave doubts upon that score.” (Accord Dennis v. United States, 341 U. S. 494, 501; Courtesy Sandwich Shop v. Port of N. T. Auth., 12 N Y 2d 379, 389; Matter of Coates, 9 N Y 2d 242, 252; Kauffman & Sons Saddlery Co. v. Miller, 298 N. Y. 38, 44.) In the case of a penal statute, there is the further doctrine of narrow construction. All of this the court ignores. Even those of us most deeply opposed to laws of this sort as a matter of policy are nevertheless expected to feel bound by standards that transcend personal preferences even in so controversial an area as free speech.
When confronted with Federal legislation, as distinguished from State statutes which it has no power to definitively interpret, the United States Supreme Court has said: ‘ ‘ This is a federal statute which we must interpret as well as judge. Herein lies the fallacy of reliance upon the manner in which this Court has treated judgments of state courts. Where the statute as construed by the state courts transgressed the First Amendment, we could not but invalidate the judgments of conviction.” (Dennis v. United States, 341 U. S. 494, 502, supra.)
“ Illicit sex ” and “ sexual immorality ” are well-known terms especially understandable in the context of “ descriptions ” thereof. “ Sexual immorality ” has long formed a part of the United States Supreme Court’s definition of obscenity (Swearingen v. United States, 161 U. S. 446, 451; Kingsley Pictures Corp. v. Regents, 360 U. S. 684, 695-696, 704-705). The validity of a statute such as section 484-h is tested according to “ ‘ the operation and effect of the statute in substance.’ ” (Kingsley *422 Books v. Brown, 354 U. S. 436, 441.) Since a formula such as vagueness serves, beyond the compulsions of genuine uncertainty, as a hedge or buffer against legislation abutting on sensitive freedoms (Smith v. California, 361 U. S. 147, 151; Baggett v. Bullitt, 377 U. S. 360), the rigor with which it is applied must vary according to the potentially inhibited area. Here, we start off with a limitation to children, a factor the absence of which was noted as controlling in Butler v. Michigan (352 U. S. 380, supra) and the presence of which turned the scales in Prince v. Massachusetts (321 U. S. 158). Its impact is further limited to the commercial distribution of literature mainly describing acts of illicit sex, leaving the home, school and library unaffected. It is in this light that I find today’s use of the vagueness doctrine most disoriented and misapplied.
Since the court has merely raised up the constitutional spectre of vagueness without resolving it, the basic free speech question is not met. If section 484-h were interpreted as the State argues (and I have outlined) there would be no constitutional infirmity. The hearings of the various State and Federal legislative committees which form part of the record before us amply demonstrate the damaging effect sordid pictorial and written sex literature have upon the development in children of a wholesome attitude and outlook on this very important area of life. A typical instance from one well-known public figure is the testimony of Mr. Norman Thomas before the United States Senate Sub-Committee to Investigate Juvenile Delinquency. He said: “ I think there is a great deal of dangerous nonsense in this appeal to the First Amendment and to the freedom of the press when one is dealing with this kind of thing. I do not believe that in order to protect the fundamental liberties of the press we have to turn our children, who are, in a sense, the root of all our society, over to the kind of visual exploitation of base emotion, and the arousal of base emotion to which, of course, this literature * * * is directed. I think it is nonsense to say that we are bound by a very extreme interpretation of the freedom of the press that we cannot act.” Mr. Thomas was only reaffirming values known to the architects of a free press, such as John Stuart Mill, who wrote in 1859: “ It is, perhaps, hardly necessary to say that this doctrine is meant to apply only to human beings in the maturity of their faculties. We are not *423 speaking of children, or of young persons below the age which the law may fix as that of manhood or womanhood. Those who are still in a state to require being taken care of by others, must be protected against their own actions as well as against external injury” (Mill, On Liberty [Oxford Univ. Press ed.] 15; see, also, Chafee, Free Speech in the United States [1941], 31F-315, 543). This legislative attempt to protect children against the “ Fanny Hills ” of literature is almost identical to the statutes of many States (R. I. Gen. Laws, § 11-31-10 [1956]; Conn. Gen. Stat. Ann., § 53-244 [1955]; Ky. Rev. Stat., §§ 436.550, 436.560 [1956]; Mont. Rev. Code, § 94-3601 [1955]; Idaho Code, tit. 18, §§ 1507, 1508 [1957]; Mass. Laws Ann., ch. 272, § 30 [1956]; Chicago Mun. Code, § 192-10.1 [1956]; Utah Code, § 76-39-5 [1963]; Md. Code Ann., art. 27, § 418B [1961]; See A. L. I. Model Penal Code [Tent. Draft No. 6, 1957], § 207.10, subd. [2]).
Rhode Island’s statute, identical to ours in relevant part, has been upheld by that State’s highest court (State v. Settle, 90 R. I. 195). It is an interesting comment on the majority’s reliance on United States Supreme Court decisions that, in the most recent obscenity case in that court, the Settle decision (supra) was cited with approval as an example of the sort of specific and narrowly drawn legislation that best meets “ The legitimate and indeed exigent interest of States and localities throughout the Nation in preventing the dissemination of material deemed harmful to children.” (Jacobellis v. Ohio, 378 U. S. 184.)
However, if the court chooses to understand the language of this statute as inviting unconstitutional restrictions on free speech, and, further, to leave such invitation unanswered by interpretation, so be it. Equally with Humpty Dumpty in ‘ ‘ Through the Looking Glass ’ ’, this court has the power to make words mean just what it wants them to mean, neither more nor less. And despite the temporizing language in the court’s opinion, I doubt whether all the king’s horses and all the king’s men can put this statute back together again. The juvenile market has been made safe for “ Fanny Hill ” et al.
The judgment below should be affirmed.

 Although first enacted in 1955 (Penal Law, § 542, L. 1955, ch. 836), the statute was transferred to the article concerning “ Children ” in the Penal Law and renumbered § 484-h (L. 1963, ch. 548). See 1963 Report of Joint Legis. Committee Studying the Publication and Dissemination of Objectionable and Obscene Materials, N. Y. Legis. Doc., 1963, No. 81.