### NOBLE v. STATE OF INDIANA.

[No. 30,642. Filed February 28, 1967.]

*Owen M. Mullin,* of Indianapolis, for appellant.

*John J. Dillon,* Attorney General, and *Virginia Dill Mc-Carty,* Deputy Attorney General, for appellee.

ARTERBURN, C. J.—The appellant, a notary public, was charged and convicted of the crime of making a false attestation as such notary. Following a trial before the judge without a jury, she was found guilty and sentenced to not less than one (1) nor more than three (3) years in the Indiana State Womens Prison.

The question before us is whether or not the finding of the court is sustained by sufficient evidence and is contrary to law. The facts are not in dispute. It appears that on March 2, 1963, Mary Noble, the appellant, was working as a clerk-typist in the Virginia Avenue license branch of Marion County, Indiana.

Frances B. W. Epsteen, a citizen of Marion County and owner of an automobile, had not paid her 1962 taxes. Mrs. Epsteen signed her name at the bottom of a Bureau of Motor Vehicles form application for license tags for 1963. Her husband took the signed application and gave it to a "Mr. Smock" together with $5.00 more than the amount required to purchase the license plate. Later he received the license plate from the "Mr. Smock." The application form which Mrs. Epsteen signed turned up filed with the Bureau of Motor Vehicles and contained the signature of Mary Noble in the blank form which was provided for the notarization of the certificate and application. The appellant had no distinct knowledge or memory of executing the certificate in question as a notary public, other than the recognition of her signature thereon as such notary. The "Mr. Smock" does not appear further in the case. Mr. Epsteen says he had only one such transaction with him.

It further appears that the appellant worked under a supervisor at the license branch, a Norma Morris, with other co-workers who were notaries at that branch. At that time the appellant and the other co-workers were processing approximately one thousand license applications per day. Long lines formed outside. The branch remained open as much as an hour after closing in order to accommodate the applicants. These applications were processed by being signed and acknowledged in the presence of the accepting clerk-notary and were stacked aside for the signature of the notary and filling in the blanks of the jurat or certificate after the license branch had closed. In other words, these applications were processed in a production line manner after closing hours. Even with this production line practice, it took them from 10:00 to 12:00 o'clock in the evening for the branch workers to process all the applications.

When the appellant first became a notary and went to work at the license branch, she was instructed as to her duties by

her supervisors and by one of the co-workers. The practice which prevailed at this license branch had prevailed there for many years in the past. It is admitted that almost all the applicants were strangers to the notaries who took their applications, and that it would have taken an unreasonable amount of time or would have been practically impossible to investigate and identify each applicant personally. The statute under which the appellant was indicted reads as follows:

> *"Falsely attesting affidavit.*—Whoever, being a notary public or other officer or person authorized to administer oaths, certifies that any person was sworn or affirmed before him to any affidavit or other instrument or writing, when, in fact, such person was not so sworn or affirmed, shall, on conviction, be imprisoned in the state prison not less than one [1] year nor more than three [3] years, and fined not less than ten dollars [$10.00] nor more than one thousand dollars [$1,000]." Acts 1905, ch. 169, § 490, p. 584, being Burns' Ind. Stat. Anno. § 10-3602 (1956 Repl.)

It is argued by the State that this statute creates strict liability, for which violation the appellant became criminally liable, regardless of any mistake or lack of personal intent. On the other hand, the appellant claims that she is the victim of a mistake and possible trickery in the processing of these applications, and at the most, is guilty only of negligence. Appellant urges that this statute should be interpreted as requiring culpability or evil intent as an element thereof. In that connection, appellant cites the Acts of 1925, ch. 213, § 8, which reads as follows:

> "The secretary of state shall provide notary public service, for the convenience of the public, when making application for licenses, at a cost of twenty five cents for each acknowledgment taken, and the notary fees so collected shall be paid into the general fund of the state."

This act has since been amended. (See Burns' Ind. Stat. Anno. § 47-2602 [1956 Repl.]).

It is contended that this statute recognized the public necessity and convenience in having an expeditious method of notarizing applications for motor vehicle registration, and that the implication is that the notaries would not be able to identify personally each applicant, but must accept an applicant's own statement as being the person he or she claims to be.

The State, on the other hand, argues that a notary has the duty of personally identifying the person who takes the oath in each case and otherwise is criminally liable if the notary errs in such identification or fails to administer the oath to the person named in the jurat. In other words, there is a strict liability on the part of a notary, and proof of a *mens rea* is not required for conviction.

In early common law, crime involved evil doing, with the intention to do harm. Without this evil meaning to the act there was no criminal liability. Thus even today, a person who takes another's property, believing it to be his own although it is not, is not guilty of larceny. There is, in other words, no *mens rea* in such a case. However, under modern statutes by virtue of the police power, many acts are now made unlawful because of the public welfare involved, which have no inherent evil in themselves or moral turpitude attached thereto. This type of statutory crime is referred to as *malum prohibitum,* as contrasted with those referred to as *malum in se,* which involve evil and moral turpitude. We view the present statute making it a crime to make a false certification as a notary to be *malum prohibitum.* In this latter type of statutes, courts have had their difficulty in determining the construction to be placed thereon as to whether or not a *mens rea,* or criminal intent, must be proved. 21 Am. Jur. 2d., *Criminal Law* § 89 (1965).

Professor Robert Force, in *Res Gestae,* Vol. X, No. 8, August, 1965 (*Mens Rea* v. *Strict Liability*), reviews to some

extent the state of the law on this question in Indiana. He says:

> "An offense which has been construed as imposing strict liability needs no proof of criminal intent, thus eliminating a number of defenses such as mistake of fact. Perhaps there is some practical as well as legal justification for this approach."

He then reviews the cases in Indiana and other states with reference to statutory rape where the girl has all the appearance of being above age and so represents the fact; where one marries believing he had been divorced; and where intoxicating liquor is sold to a minor under mistake and error or without the knowledge of the owner of the establishment. *Heath v. State* (1910), 173 Ind. 296, 90 N. E. 310; *Boos v. State* (1914), 181 Ind. 562, 105 N. E. 117; *Mulreed v. The State* (1886), 107 Ind. 62, 7 N. E. 884; *Squire v. The State* (1874), 46 Ind. 459.

The basic case from the United States Supreme Court on the question of *scienter* and guilty knowledge or intent is *Smith v. California* (1959), 361 U. S. 147, 80 S. Ct. 215, 4 L. Ed. 2d 205, 211. In that case the United States Supreme Court held that the State could not eliminate in its criminal statute the element of a guilty knowledge on the part of one charged with the crime of disseminating obscene matter. At the same time it attempted to distinguish such a case from that of the dissemination of spoiled food and adulterated drugs, where it had previously held that no guilty knowledge was necessary and that a strict liability existed. In attempting a distinction in the cases the Court said:

> ". . . The usual rationale for such statutes is that the public interest in the purity of its food is so great as to warrant the imposition of the highest standard of care on distributors—in fact an absolute standard which will not hear the distributor's plea as to the amount of care he has used. (Cases cited) His ignorance of the character of the food is irrelevant."

In *State* v. *Kuebel* (1961), 241 Ind. 268, 172 N. E. 2d 45, the Court of this State followed the United States Supreme Court decision above, the writer of this opinion dissenting however upon the ground that so far as public welfare and police power were concerned, there should be no distinction between rotten literature and rotten meat when it came to the protection of public health, whether it be mental or physical; that strict liability in such area was for the legislature to determine if it saw fit.

We do not, however, have that issue here involved. The act charged here is purely *malum prohibitum* and not *malum in se*. There is no evil or moral turpitude involved in making a notary's certificate. It is made unlawful only in cases where the act does not conform with the details of the statute. We believe that a *mens rea* or intent to violate the statute must exist in such instances to become a crime.

It is our construction of the statute involved that a *mens rea* or criminal intent must be proved to support a conviction thereunder. We are supported in this view by the case of *Shonfeld* v. *State* (1941), 219 Ind. 654, 666, 40 N. E. 2d 700, 705. In that case the defendant was charged with counseling and procuring a notary public to falsely certify to a certificate. The court held that for the defendant to be guilty, it must be shown that the notary public intentionally and falsely so certified. In other words, a *mens rea* must be shown to exist to support a conviction, and the legislature did not impose a strict liability, regardless of intent or mistake. The court said:

"... An examination of the evidence indicates very clearly that at the time this affidavit was made, none of the parties involved understood the legal meaning of the jurat or how an oath should be administered. Since the affidavit was on the claim of Jack Shonfeld, it was apparently assumed by the notary, and possibly by the others, that his name should be written in the affidavit in the blank space provided for the name of the affiant. From this affidavit and jurat, however, it cannot be reasonably inferred that Sylvia Beiriger, the

notary, intended to, or did, certify that the appellant subscribed and swore to the affidavit. Therefore, since she, as principal, was not guilty of the crime charged, the conviction of the appellant for having 'counseled, encouraged and procured' her to falsely certify 'that said Jack Shonfeld has subscribed his name and was sworn by her' to said affidavit cannot be sustained. *Murphy* v. *State* (1915), 184 Ind. 15, 110 N. E. 198."

Professor Force's article (*Mens Rea* v. *Strict Liability, supra*) also supports us in the view we take in this matter.

"Indiana has taken what may be characterized as an enlightened or legally correct view in requiring mens rea in many statutory offenses. Mistake of fact is recognized as a defense in these cases. But this is not to suggest that strict liability has no place in Indiana law, nor has it never been imposed. In effect, strict liability has been restricted by and large to matters which concern the public at large such as in matters dealing with foodstuffs or economics. It has been avoided usually in other offenses. To the state's credit, this approach has not been swept along by a modern trend but is deeply engrained in older authorities."

He points out, however, that the main exceptions to the rule in Indiana are cases of statutory rape. We are not concerned here with the law applicable to such exceptions involving violations *malum in se*.

It is to be noted that what has been said in this opinion has nothing to do with any civil liability for damages which may result from negligence, error, or fraud of a notary public in certifying to a notarization which is false or incorrect in cases where innocent parties have relied upon such certifications, to their damage or injury.

The judgment of the trial court is reversed, with directions that the defendant be discharged.

Jackson, J., concurs in result.

Myers, J., not participating.

NOTE.—Reported in 223 N. E. 2d 755.