Ron BRAWER, Plaintiff,

v.

Cornelius CARTER, III,
et al., Defendants.

No. 94 Civ. 4632 (DC).

United States District Court,
S.D. New York.

Aug. 29, 1996.

Lansner & Kubitschek by Carolyn A. Kubitschek, New York City, for Plaintiff.

Paul A. Crotty, Corporation Counsel of the City of New York by Jane Momo, Elizabeth A. Wright, Assistant Corporation Counsel, New York City, for Municipal Defendants.

### MEMORANDUM DECISION

CHIN, District Judge.

Plaintiff Ron Brawer ("Brawer") brings this civil rights action pursuant to 42 U.S.C. § 1983 and state law. Defendants Detectives Cornelius Carter, George DelGrosso, Paul Warren, Sergeants William Hassett and Glenn Vukov, and Police Officers Lana Bailey, Jose DeJesus, Diane Greco, Janet O'Keefe,[1] Nicholas Reina, Iris Rivera, and the City of New York move for summary judgment pursuant to Fed.R.Civ.P. 56(b) dismissing the Amended Complaint as to them. For the reasons set forth below, the motion is granted in part and denied in part.

### BACKGROUND

#### A. Nature of the Case

Brawer asserts various federal civil rights and state law claims arising from a bitter custody dispute with his ex-wife, Tonya Pinkins ("Pinkins").[2] He alleges that Pinkins "became friendly" with the police and, in effect, persuaded the defendant detectives and police officers to interfere in the custody dispute by, among other things, arresting him twice.

#### B. The Facts

Brawer and Pinkins were married on February 10, 1987 and had two children. The couple separated in November 1992, and Pinkins moved out of their New York City loft and into a house in New Jersey. In November 1992, Brawer commenced a proceeding against Pinkins in the Supreme Court of the State of New York, New York County, to obtain custody of the children.

On April 7, 1993, the parties entered into a stipulation on the use of the loft and custody of the children for the period of April 7, 1993 to June 30, 1993, which was so ordered by Justice Eliot Wilk of the Supreme Court of the State of New York (the "April 7th Order"). (*See* Def.Exh. G). Among other things, the April 7th Order provided that Brawer was to have exclusive use and occupancy of the loft, and custody of the children, from Wednesday at 7:30 p.m. through Saturday at 10:00 p.m. From Saturday at 10:00 p.m. through Wednesday at 7:30 p.m. Pinkins was to have similar privileges. (*See* Def.Exh. G).

Disputes arose between Brawer and Pinkins over their use of the loft. On May 10, 1993, Brawer brought contempt proceedings against Pinkins for her alleged violations of the April 7th Order. (*See* Def.Exh. I). In turn, on June 3, 1993, Pinkins filed, and Judge Friedman signed, an order to show cause based upon Brawer's alleged violations of the April 7th Order. (*See* Def. Exh. J). The order to show cause contained an order of protection (the "June 3rd Order of Protection"), which prohibited Brawer from having any contact with Pinkins pending a hearing on the contempt charges. (*See* Def.Exh. J). As of April 10, 1995, the contempt proceedings had not been resolved. (*See* Def.Exh. K, at 8).

The following incidents stemming from the custody dispute form the basis of plaintiff's claims:

#### 1. The June 21, 1993 Check Incident

On June 21, 1993, Brawer filed criminal charges in the 13th Precinct against Pinkins for fraudulently signing a number of checks on his business account totalling approximately $9,600. (Brawer Dep. at 76–77). Pinkins, who was not a signatory on the account, took the checks from Brawer's filing

---

**1.** Police Officer Janet O'Keefe has changed her last name from Brenner to O'Keefe. Hereinafter, she will be referred to as O'Keefe.

**2.** Pinkins is also named as a defendant herein.

cabinet and used them to pay bills. (*See id.* at 75–76).

At the precinct, Brawer was referred to the detective squad where he spoke to Detectives Cornelius Carter ("Carter") and Paul Warren ("Warren"). (Brawer Dep. at 77, 78–79). Brawer told the detectives that he wanted to file a complaint against Pinkins because she had taken his checks without authorization. (*Id.* at 82). Carter and Warren refused to file a complaint, stating that no crime had been committed. (*Id.* at 80–81).

### 2. The June 26, 1993 Arrest

On Saturday, June 26, 1993, Brawer was to vacate the loft at 10:00 p.m., as required by the April 7th Order. Paulina, Pinkins's au pair, arrived at the loft at approximately 9:00 or 9:15 p.m. to pick up the children. (Brawer Dep. at 88).[3] Brawer told Paulina that she was early and asked her to wait until the regular time before leaving with the children. (*Id.*).

At 10:00 p.m., Pinkins rang the apartment's intercom from the lobby of the building. (Brawer Dep. at 88). Brawer answered and heard several voices, including Pinkins's. (*Id.*). Pinkins said "I'm here, let me up," and Brawer buzzed her into the apartment building. (*Id.*). When the elevator arrived, Brawer heard several voices laughing and saw that someone's hand was covering the peephole so that he could not see inside the elevator, which opens into the apartment. (*Id.* at 88–89). Brawer asked Pinkins to identify the people who were with her and to remove her hand from the peephole, but she simply said "let me in." (*Id.* at 89). Brawer stated to Pinkins: "Why don't you just send Paulina up by herself, the way we normally do it, and I'll leave. I'm ready to go." (*Id.*). When Pinkins continued to ask Brawer to let her into the apartment, Brawer stated that he would not let her in until he saw who was

with her, stating that he felt threatened.[4] (*Id.*). Pinkins then stated that she would call the police and left. Brawer also called 911, explaining the situation and stating that he was concerned for the safety of his children. (*Id.* at 89–90).

Defendant Police Officers O'Keefe and Greco arrived at the loft at approximately 10:15 to 10:20 p.m. (O'Keefe Dep. at 67). There they met Pinkins, who showed them a court order.[5] O'Keefe testified that Brawer opened the door to the officers without any resistance. (*Id.* at 32). Brawer testified that he told the officers that he "was leaving." (Brawer Dep. at 95, 108). Yet, O'Keefe or Greco informed Brawer that he would be arrested for failure to leave the loft by 10:00 p.m. (*Id.* at 31–34). Pursuant to police policy, O'Keefe called for a sergeant to come to the scene and approve the arrest. (*Id.* at 33).

Thereafter, defendant Sergeant Vukov arrived at the loft, accompanied by three police officers he was training, defendants Bailey, Rivera, and DeJesus. Defendants Sergeant Hassett and Officer Reina were next to arrive.

Officers O'Keefe and Greco arrested Brawer, as instructed by either Sergeant Hassett or Sergeant Vukov or both. (*See* O'Keefe Dep. at 37–38 (stating that Sergeant Vukov instructed her to arrest Brawer); Hassett Dep. at 24 (stating that he instructed the officers to arrest Brawer); Vukov Dep. at 9, 13, 16 (stating that, although he was in backup role, both he and patrol sergeant Hassett decided to arrest Brawer)).

After arresting Brawer, O'Keefe and Greco drove him to the 13th Precinct, where he was placed in a cell. (Brawer Dep. at 109–110). After two hours, Brawer was taken to Central Booking, where he was held from approximately 1:00 a.m. to noon or 1:00 p.m. on Sunday, June 27, 1993. (*Id.* at 111, 112). He

---

**3.** Despite her right of occupancy, Pinkins did not stay at the loft with the children. Instead, she would regularly send Paulina to bring the children to the New Jersey house. (Brawer Dep. at 91).

**4.** Brawer's concern stemmed from events earlier that day—when Pinkins had returned the children to Brawer that afternoon, there were "two

men in the car with [Pinkins] who glared at [Brawer] in a very unfriendly manner." (Brawer Dep. at 87).

**5.** It is not clear whether Pinkins showed the officers the April 7th Order or the June 3rd Order of Protection.

was then transferred by van with 20 to 25 other people to 100 Centre Street, where he was held for approximately six hours until his arraignment. (*Id.* at 112–14). Brawer was charged with Criminal Contempt in the Second Degree for violating the April 7th and June 3rd court orders. (*See* Def.Exh. M). Brawer was then released on his own recognizance. (Brawer Dep. at 114).

On August 5, 1993, the Criminal Court dismissed the criminal charges on application of the Assistant District Attorney and pursuant to an order signed by Justice Friedman, (*see* Def.Exh. P), with the understanding that they would be handled by Justice Friedman as part of the divorce and custody proceedings. (*See* Def.Exh. Q). The record is incomplete with respect to the subsequent history of the charges stemming from this arrest.

### 3. The July 20, 1993 Arrest

On July 1, 1993, Brawer changed the locks to the loft, pursuant to his understanding of an oral order that Justice Friedman dictated from the bench on June 26th or 27th concerning custody of the children for the summer. (Brawer Dep. at 127–28). A written order issued by Justice Friedman on July 1, 1993, however, did not grant exclusive rights to the loft to either Brawer or Pinkins (the "July 1st Order"). (*See* Def.Exh. H ¶ 3).

On July 4, 1993, Pinkins filed a complaint with the 13th Precinct against Brawer for evicting her from the loft in violation of Justice Friedman's July 1st order. (*See* Def. Exh. N). At the precinct, Pinkins was referred to defendant Detective Carter. This was the first time Pinkins met defendant Carter. (Carter Dep. at 58).

Pinkins showed Carter a court document that she said Brawer was violating. (Carter Dep. at 59). Carter determined that it was an order of protection that granted the spouses joint use of the apartment. (*Id.* at 62). From Pinkins's allegations, Carter determined that Brawer had committed an unlawful eviction, which Carter believed to be a misdemeanor. (*Id.* at 62–63). Carter filed a complaint and told Pinkins to contact Brawer

or his lawyers to obtain keys to the loft. (*Id.* at 66–67).

Pinkins returned to the 13th precinct on July 15, 1993 and told Carter that she had been unable to get in touch with Brawer, except that on one occasion Brawer had refused to give her the key. (Carter Dep. at 68–69, 74). Carter suggested that Pinkins hire a locksmith to change the locks and that she give Brawer a copy of the new key. (*Id.* at 75).

Thereafter, at approximately 8:30 a.m., Carter and Warren drove Pinkins to the loft where they remained with her until a locksmith changed the locks. (Carter Dep. at 76, 79–80; Warren Dep. at 34, 51–55). While Carter was in the loft with Pinkins, she showed him a book that belonged to plaintiff. (*See* Carter Dep. at 81). Brawer claims that the book was removed from the loft and used as evidence in the custody case. (Brawer Dep. at 126; *see* Transcript of Aug. 11, 1993 Custody Hearing at 436–37). After seeing the journal, Carter told Pinkins that the children's visits with Brawer should be supervised, and that she "should alert somebody" with respect to Brawer's "type of thoughts." (*See* Transcript of Aug. 11, 1993 Hearing at 438).

After the locks were changed, Carter and Warren drove Pinkins to her place of employment at ABC Studios on 60th Street in Manhattan.[6] (Carter Dep. at 119–20; Warren Dep. at 55–56). Carter and Warren went inside the studio with Pinkins, who introduced them to the actors and the people involved in her show. (Carter Dep. at 120).

On July 20, 1993, at approximately 3:30 p.m., Detectives Carter and DelGrosso went to NBC studios in Brooklyn, Brawer's place of employment, where they arrested him without a warrant. (Carter Dep. at 86–89; Brawer Dep. 130, 132). The detectives, who were dressed in plainclothes, escorted Brawer as he prepared to leave the office, and then brought him to an unmarked car, where they handcuffed him. (Brawer Dep. 133–37). Brawer was taken to the 13th Precinct and placed in a cell. (Brawer Dep. at 138). Because there was no night court that evening,

---

6. During the summer of 1993, Pinkins was an actress on an ABC soap opera.

Brawer waited overnight before he was arraigned on July 21, 1993. (Brawer Dep. at 140–41). Brawer was charged with Criminal Contempt in the Second Degree and Unlawful Eviction. (*See* Def.Exh. O).

On August 5, 1993, the Criminal Court dismissed the charges, together with the charges relating to the July 20th arrest, to be handled by Justice Friedman as part of the divorce and custody proceedings. (*See* Def. Exh. Q). There is no subsequent history of the charges stemming from this arrest in the record before me.

### C. *The Instant Action*

Brawer brings this action asserting thirteen claims. Counts 1 through 6 and 11 of the Amended Complaint assert section 1983 claims based upon alleged violations of plaintiff's rights under the United States Constitution; counts 7 through 10, 12, and 13 assert state law claims. Defendants now move for summary judgment dismissing the claims against them. For the reasons that follow, the motions are granted in part and denied in part.

### *DISCUSSION*

### 1. *Summary Judgment Standard*

Summary judgment may be granted when "there is no genuine issue as to any material fact and . . . the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c); *see Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 585–87, 106 S.Ct. 1348, 1355–56, 89 L.Ed.2d 538 (1986). Accordingly, the Court's task is not to "weigh the evidence and determine the truth of the matter[,] but to determine whether there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249, 106 S.Ct. 2505, 2511, 91 L.Ed.2d 202 (1986). To create an issue for trial, there must be sufficient evidence in the record favoring the party opposing the motion to support a jury verdict in that party's favor. *Id.* at 249–50, 106 S.Ct. at 2510–11. "[S]ummary judgment will not lie if . . . the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* at 248, 106 S.Ct. at 2510.

### 2. *Lack of Personal Involvement*

As an initial matter, Police Officers Bailey, DeJesus, Rivera, and Reina and Detective Warren argue that summary judgment should be granted in their favor because they were not personally involved in the alleged deprivation of plaintiff's rights. Personal involvement on the part of a defendant is a prerequisite to a suit for damages under section 1983. *Williams v. Smith*, 781 F.2d 319, 323 (2d Cir.1986).

Because plaintiff has submitted no evidence that officers Bailey, DeJesus, Rivera, and Reina were personally involved in the June 26, 1993 arrest, the motion for summary judgment is granted with respect to these defendants. Officers Bailey, DeJesus, and Rivera had merely accompanied Sergeant Vukov as part of their on-the-job training. Officer Reina had driven Sergeant Hassett to the loft in response to Officer O'Keefe's request for a sergeant to approve the arrest. Indeed, Brawer alleges only that these four officers "looked inside, saw there was not a threatening situation, and left." (Brawer Dep. at 106). Brawer has presented no evidence that these officers participated in the conversation among the sergeants and Officer O'Keefe, read or examined the court orders presented by Pinkins, or participated in the decision to arrest Brawer. Nor was there any contact between Brawer and these four defendants. I hold that, as a matter of law, Brawer has failed to show personal involvement on the part of Officers Bailey, DeJesus, Rivera, and Reina. Accordingly, summary judgment is granted in favor of these defendants.

Defendant Warren moves for summary judgment dismissing the claims asserted against him in counts 5 and 10 based on his lack of personal involvement in the July 20, 1993 arrest of Brawer at NBC studios. According to Brawer's testimony, only Carter and DelGrosso were present during his July 20, 1993 arrest. (Brawer Dep. at 131). Nor does Brawer allege that Warren was involved in the July 20th arrest in any other capacity. Accordingly, the claims against Warren based on the July 20, 1993 arrest are dismissed.

### 3. Plaintiff's Claim Against the City of New York

In Count 11 of the Amended Complaint Brawer asserts a section 1983 claim against the City of New York (the "City") based upon the City's purported failure to adequately train and supervise its police officers and upon allegedly unconstitutional policies maintained by the City.

Plaintiff's failure to train and supervise claim must be dismissed, as Brawer has not presented any evidence that the City was deliberately indifferent in training or supervising its police officers. *See City of Canton, Ohio v. Harris,* 489 U.S. 378, 388, 109 S.Ct. 1197, 1204, 103 L.Ed.2d 412 (1989) ("[T]he inadequacy of police training may serve as the basis for § 1983 liability only where the failure to train amounts to deliberate indifference to the rights of persons with whom the police come into contact.") (footnote omitted).

The City also moves for summary judgment on the ground that Brawer has failed to show that a municipal practice or custom caused the violation of his constitutional rights. Because municipalities cannot be held liable under section 1983 on a theory of respondeat superior, Brawer must show that an official practice or custom caused the constitutional deprivation. *See Monell v. Department of Social Servs.,* 436 U.S. 658, 694, 98 S.Ct. 2018, 2037–38, 56 L.Ed.2d 611 (1978). As Brawer has failed to present evidence sufficient to show that an issue of fact exist as to whether an official policy or custom caused the deprivation of his constitutional rights, his claim against the City must fail. *See Sarus v. Rotundo,* 831 F.2d 397, 400 (2d Cir.1987).

Brawer bases his claim of an unconstitutional policy upon the provisions of the New York City Police Department Patrol Guide in effect at the time of the events giving rise to this action, which directed police officers to make an arrest "where there is probable cause that a felony has been committed or an individual fails to comply with the terms of an order of protection." (*See* Patrol Guide § 110–38(5)). Brawer argues that the Patrol Guide policy is unconstitutional because it permits police officers to arrest an alleged violator of an order of protection without probable cause to believe that the individual intentionally violated a court order, as required by the criminal contempt statute, N.Y.Penal Law § 215.50(3) (McKinney 1988).

Plaintiff fails to recognize, however, that a different statute, Family Court Act § 168(1), expressly authorizes an arrest based merely upon a violation of an order of protection, without expressly requiring probable cause to believe that the violation was intentional. *See* Family Court Act § 168(1) (McKinney 1983) ("The presentation of a copy of an order of protection or temporary order of protection ... to any ... police officer shall constitute authority for him to arrest a person charged with violating the terms of such order of protection or temporary order of protection...."); *see also Otero v. Jennings,* 698 F.Supp. 42, 45 (S.D.N.Y.1988) ("New York equates an order of protection with a showing of probable cause.").

Nor does the absence of an express requirement of intent render the patrol guide provision or Family Court Act section 168 unconstitutional. Courts generally do not infer strict liability merely from the absence of an express intent requirement, *see People v. Coe,* 71 N.Y.2d 852, 527 N.Y.S.2d 741, 742, 522 N.E.2d 1039, 1040 (1988), and, in any event, strict criminal liability has been upheld in the public welfare context. *See United States v. Cordoba–Hincapie,* 825 F.Supp. 485, 506 (E.D.N.Y.1993); *see also Smith v. California,* 361 U.S. 147, 150, 80 S.Ct. 215, 217, 4 L.Ed.2d 205 (1959). Accordingly, Brawer's *Monell* claim against the City is dismissed.

### 4. Arrest Without Probable Cause/ False Arrest

Counts 1 and 3 assert that on June 26th and July 20th, respectively, defendants arrested plaintiff without a warrant and without probable cause in violation of the Fourth Amendment. Counts 7 and 9 assert state law claims for false arrest based upon the June 26th and July 20th arrests, respectively. Count 11 asserts a state law claim for unlawful imprisonment based upon the July 20th arrest. As the torts of false arrest and false

imprisonment are the same under New York law, *Posr v. Doherty,* 944 F.2d 91, 96 (2d Cir.1991), I will consider count 11 with count 9.

■ The elements of a section 1983 claim for arrest without probable cause and a claim for false arrest under state law are "substantially the same," except that the former must be under color of state law. *See Posr,* 944 F.2d at 96 (*quoting Raysor v. Port Auth. of New York & New Jersey,* 768 F.2d 34, 39–40 (2d Cir.1985), *cert. denied,* 475 U.S. 1027, 106 S.Ct. 1227, 89 L.Ed.2d 337 (1986)). To recover for false arrest, plaintiff must prove: (1) that defendants intended to confine him; (2) that he was conscious of the confinement and did not consent to it; and (3) that the confinement was not otherwise privileged. *Lowth v. Town of Cheektowaga,* 82 F.3d 563, 569 (2d Cir.1996) (*citing Broughton v. New York,* 37 N.Y.2d 451, 373 N.Y.S.2d 87, 93, 335 N.E.2d 310 *cert. denied sub nom. Schanbarger v. Kellogg,* 423 U.S. 929, 96 S.Ct. 277, 46 L.Ed.2d 257 (1975)). Defendants argue that the arrests were privileged because the arresting officers had probable cause to arrest Brawer on both June 26 and July 20.

■ Probable cause to arrest exists where, at the time of the arrest, the officers "have knowledge or reasonably trustworthy information sufficient to warrant a person of reasonable caution in the belief that an offense has been committed by the person to be arrested." *Golino v. New Haven,* 950 F.2d 864, 870 (2d Cir.1991) (*citing Dunaway v. New York,* 442 U.S. 200, 208 n. 9, 99 S.Ct. 2248, 2254 n. 9, 60 L.Ed.2d 824 (1979), *cert. denied sub nom. Lillis v. Golino,* 505 U.S. 1221, 112 S.Ct. 3032, 120 L.Ed.2d 902 (1992)). "Whether probable cause exists must be determined on the basis of the totality of the circumstances." *In re Seizure of All Funds in Accounts in the Names Registry Publishing, Inc.,* 68 F.3d 577, 580 (2d Cir.1995) (citation omitted).

### a. Probable Cause for the June 26th Arrest

■ Defendants argue that they had probable cause to arrest Brawer on June 26, 1993 because: (1) Brawer was present in the loft after 10:00 p.m., in contravention of the April 7th Order, and (2) Brawer's presence in the loft at the time that Pinkins had use of the loft violated the June 3rd Order of Protection. Given the circumstances of the June 26th arrest, I hold that a reasonable jury could find that a reasonably prudent officer did not have probable cause to believe that Brawer was committing an offense. Accordingly, the motion for summary judgment with respect to the claims based on the June 26th arrest is denied.

First, defendants argue that they had probable cause to arrest Brawer for criminal contempt for violating the April 7th Order. New York Penal Law section 215.50(3) defines criminal contempt in the second degree as "[i]ntentional disobedience or resistance to the lawful process or other mandate of a court." N.Y.Penal Law § 215.50(3) (McKinney 1988).[7] While there is no dispute regarding Brawer's presence in the loft past 10:00 p.m., there is substantial disagreement concerning his willingness to leave the loft. Although Hassett testified that plaintiff was "insistent that he wasn't going to leave," (Hassett Dep. at 21), Brawer testified that he told the officers that he "was leaving." (Brawer Dep. at 95, 108). O'Keefe's belief that Brawer refused to leave the loft was based on what Pinkins told her. (O'Keefe Dep. at 33–34). O'Keefe, who had noticed Brawer's duffel bag near the door, conceded that he "might" have told her that he was planning to take the duffel bag with him when he left, (O'Keefe Dep. at 48), indicating that Brawer intended to leave.

In addition, the circumstances surrounding the arrest weigh against a finding of probable cause. According to Brawer, he had remained in the loft after 10:00 because Pinkins refused to identify her companions and he was concerned for the children's safety. At her deposition, O'Keefe did not recall

---

**7.** Criminal contempt in the second degree is a class A misdemeanor for which an officer may arrest an individual. *See* N.Y.Penal Law § 10(6) (McKinney 1987); N.Y.Penal Law § 215.50(3) (McKinney 1988); N.Y.Crim.Proc.Law § 140.10(1)(b) (McKinney 1992).

whether she asked Brawer why he had not left the loft. (O'Keefe Dep. at 33). Moreover, the police found Brawer in the apartment only a short time after 10:00, and Brawer willingly opened the door when Officer O'Keefe arrived.

Defendants also argue that they had probable cause to arrest Brawer for violating the June 3rd Order of Protection under the New York City Police Department Patrol Guide, which requires officers to arrest an individual who has violated an order of protection. (*See* Patrol Guide § 110–38(5)). The evidence before me, however, could support a finding that Brawer was arrested for refusing to leave the loft by 10:00, not because he was in Pinkins's presence in violation of the June 3rd Order of Protection. (*See* Hassett Dep. at 24 (stating that he would not have arrested Brawer if Brawer had been willing to leave the premises); O'Keefe Dep. at 34 (stating that she decided to arrest Brawer for criminal contempt because he failed to leave at time specified in court order); Vukov Dep. at 13 (stating that he and Hassett were shown "court paper" dealing with "the rights to the location or something to that effect" and that Brawer was "arrested for violating the order.")). Vukov also testified that he "believe[d] it was a court order, not a regular order of protection." (*Id.* at 15).

Considering the totality of the circumstances, and drawing all inferences in favor of plaintiff, I hold that a reasonable jury could conclude that the officers did not have probable cause to believe that Brawer had intentionally violated the April 7th Order or that he had violated the June 3rd Order of Protection. Accordingly, defendants' motion for summary judgment with respect to counts 1 and 7 is denied.

### b. *Probable Cause for the July 20th Arrest*

██ Defendants argue that they had probable cause to arrest plaintiff on July 20, 1993 for criminal contempt and for unlawfully evicting Pinkins. Under the Penal Law, a person is guilty of criminal contempt in the

second degree if such person engages in "[i]ntentional disobedience or resistance to the lawful process or other mandate of a court." N.Y.Penal Law § 215.50(3) (McKinney 1988).[8]

Considering the totality of circumstances surrounding the July 20th arrest, I hold that a reasonable jury could find that Carter and DelGrosso lacked probable cause to arrest Brawer on July 20, 1993. First, Carter and DelGrosso arrested Brawer five days *after* Carter and Warren had helped Pinkins gain access to the loft. Given that the situation had been remedied, it is unclear why Carter did not simply issue a summons, as recommended by the N.Y.P.D. Student's Guide. (*See* N.Y.P.D. Police Student's Guide—Law, Ch. 4, at 13 (providing that officers should issue summons instead of arresting where one charged with unlawful eviction has not prevented occupant from reentering premises)). Second, Carter and DelGrosso arrested Brawer at his place of work during business hours. As Pinkins had already gained access to the loft, there was no exigency requiring the officers to arrest Brawer at his place of employment and without obtaining a warrant.

In addition, Carter's statements regarding his attempts to contact Brawer to resolve the matter are inconsistent and conflict with plaintiff's deposition testimony. Carter testified at his deposition that he called Brawer at his home and called the office of Brawer's attorney and left messages on at least one answering machine (Carter Dep. at 70, 72) in an attempt "to alleviate the situation." (*Id.* at 68). Later in his deposition, Carter stated that he did in fact speak with either Brawer or with his attorney about having Brawer go to the 13th Precinct to discuss the situation. (Carter Dep. at 86). At the custody hearing in Supreme Court, however, Carter claimed that every time he called the attorney he got a busy signal. (*See* Transcript of Aug. 11, 1993 Custody Hearing at 433–34). Brawer testified at his deposition that he did not receive any telephone calls or messages from

---

8. As with criminal contempt, unlawful eviction is a class A misdemeanor for which an individual may be arrested. *See* N.Y.Penal Law § 10(6) (McKinney 1987); Administrative Code of the City of New York §§ 26–521(3) and 26–523; N.Y.Crim.Proc.Law § 140.10(1)(b) (McKinney 1992).

Detective Carter prior to July 20th, nor did he receive any messages from Carter at NBC Studios. (Brawer Dep. at 129).

In light of these disputed facts and the circumstances surrounding the July 27th arrest, a reasonable jury could find that Carter lacked probable cause and that Brawer was unlawfully arrested. Accordingly, the motion for summary judgment with respect to counts 3, 9, and 11 is denied.

### 5. Malicious Prosecution/Prosecution Without Probable Cause

Counts 2 and 5 assert section 1983 claims for malicious prosecution and prosecution without probable cause in violation of the 4th and 14th Amendments based on the charges filed in relation to the June 26th and July 20th arrests, respectively.[9] Counts 8 and 10 assert claims for malicious prosecution under state law based upon the charges stemming from the June 26th and July 20th arrests, respectively.

 Malicious prosecution claims asserted under section 1983 are governed by state law. *Russell v. Smith,* 68 F.3d 33, 36 (2d Cir.1995) *(citing Janetka v. Dabe,* 892 F.2d 187, 189 (2d Cir.1989)). To recover for malicious prosecution under New York law, plaintiff must show: (1) that the defendant commenced a criminal prosecution against him; (2) that the proceeding was terminated in plaintiff's favor; (3) that there was no probable cause to prosecute the plaintiff; and (4) that the proceeding was instituted with malice. *Lowth,* 82 F.3d at 571 *(citing Colon v. City of New York,* 60 N.Y.2d 78, 468 N.Y.S.2d 453, 455, 455 N.E.2d 1248, 1249 (1983)); *see Broughton,* 373 N.Y.S.2d at 94, 335 N.E.2d at 314.

 Because Brawer has failed to submit any proof that the criminal proceedings based on the June 26th and July 20th arrests terminated in his favor, summary judgment is granted in favor of defendants with respect to these claims. *See Heck v. Humphrey,* 512 U.S. 477, ——, 114 S.Ct. 2364, 2371, 129 L.Ed.2d 383 (1994); *Singer,* 63 F.3d at 118.

The only evidence in the record concerning the resolution of the criminal charges is the transcript from the proceedings on August 5, 1993 before Criminal Court Judge Harvey Glasser. Rather than showing that the charges terminated in Brawer's favor, however, this transcript merely indicates that the matters were transferred to Justice Friedman:

> At this time, the People move to dismiss [the charges ensuing from the arrests of June 26 and July 20, 1993]. These matters are currently pending before Judge Friedman, and they're in the Supreme Court. They arise out of the divorce and custody proceedings. It is the People's position that this matter could be better dealt with before that Judge.

(*See* Def.Exh. Q). This evidence is insufficient to support a finding that the criminal charges were resolved on the merits in Brawer's favor. Therefore, summary judgment is granted with respect to counts 2, 5, 8, and 10.

### 6. Illegal Search and Seizure

██ Count 4 asserts a claim for illegal search and seizure based upon Carter's and Warren's entrance to the loft on July 15, 1993, when Pinkins showed Brawer's journal to Carter. Defendants argue that Brawer's claim for illegal search and seizure must be dismissed because Pinkins, a lawful tenant of the loft, invited Carter and Warren into the apartment. I agree.

It is well-settled that consent is an exception to the requirements of a warrant and probable cause. *Schneckloth v. Bustamonte,* 412 U.S. 218, 219, 93 S.Ct. 2041, 2043–44, 36 L.Ed.2d 854 (1973). Consent may be obtained from a party who possesses common

---

9. To the extent that plaintiff's section 1983 malicious prosecution claims are based upon the Due Process Clause of the 14th Amendment, these claims must be dismissed. *See Albright v. Oliver,* 510 U.S. 266, 273–75, 114 S.Ct. 807, 813–14, 127 L.Ed.2d 114 (1994) (holding that no claim exists under 14th Amendment for prosecution without probable cause). Plaintiff's section 1983 malicious prosecution claims are not affected by *Albright* to the extent they assert an unlawful seizure in violation of the Fourth Amendment. *See Singer v. Fulton County Sheriff,* 63 F.3d 110, 114–16 (2d Cir.1995), *cert. denied,* —— U.S. ——, 116 S.Ct. 1676, 134 L.Ed.2d 779 (1996); *cf.*

authority over the premises to be inspected. *United States v. Matlock*, 415 U.S. 164, 171, 94 S.Ct. 988, 993, 39 L.Ed.2d 242 (1974). Brawer maintains that Pinkins's consent was not sufficient to allow a search of the loft on Thursday, July 15, 1993, because Pinkins did not have the right to be in the loft on Thursdays pursuant to the April 7th Order. In his deposition, however, Brawer acknowledges that the April 7th Order expired on approximately June 26, 1993 and that Justice Friedman's July 1, 1993 custody order, which was to remain in effect until Labor Day, provided that neither Brawer nor Pinkins had the exclusive right to occupy the loft. (Brawer Dep. at 120–21; *see* July 1, 1993 Order ¶ 3).[10] As Justice Friedman's July 1st Order gave Pinkins legal access to the loft, she was capable of consenting to the officers' entry and alleged search of the loft. Hence, the purported search and seizure was lawful and cannot give rise to liability under section 1983. Accordingly, count 4 must be dismissed.

### 7. *Conspiracy Charge*

In count 6, plaintiff alleges that the police officers conspired with Pinkins to deprive plaintiff of the custody of his children. Plaintiff may recover under section 1983 for a conspiracy to violate his constitutional rights where there has been an actual violation of his constitutional rights. *Singer*, 63 F.3d at 119 (*citing Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 150, 90 S.Ct. 1598, 1604–05, 26 L.Ed.2d 142 (1970)).

Because I have denied the motion for summary judgment with respect to plaintiff's section 1983 claims based upon arrest without probable cause, a reasonable jury could find that Brawer's constitutional rights were violated. In addition, despite Carter's testimony that he first met Pinkins when she went to the 13th Precinct on July 4, 1993,

there is sufficient evidence for a reasonable jury to find that Carter and Warren conspired with Pinkins to deprive Brawer of his constitutional rights based upon the following incidents. First, Carter and Warren did not file a complaint against Pinkins for writing checks on Brawer's business account, despite the fact that she was not a signatory to that account. Second, after helping Pinkins regain access to the loft after Brawer had changed the locks, Carter and Warren accompanied her to her place of work at ABC studios, where she introduced them to various actors and actresses. Third, Carter arrested Brawer at his place of work five days after helping Pinkins change the locks. Because a reasonable jury could find that Pinkins and Carter had conspired to deprive Brawer of his constitutional rights in relation to the custody battle, the motion for summary judgment on the conspiracy claims against Carter and Warren is denied. Because there are no facts indicating that Officers O'Keefe, Greco, Rivera, DeJesus, Bailey, and DelGrosso and · Sergeants Hassett and Vukov had any contact with Pinkins other than in relation to the June 26th and July 20th arrests, summary judgment is granted on count 6 in favor of those defendants.[11]

### 8. *Abuse of Process*

Count 13 of the Amended Complaint asserts a state law claim for abuse of process against Detective Carter based on the July 20th arrest. Under New York law, abuse of process occurs when defendants (1) employ regularly issued legal process to compel performance or forbearance of some act, (2) with the intent to do harm without excuse or justification, (3) in order to obtain a collateral objective beyond the legitimate ends of the process. *Cook v. Sheldon*, 41 F.3d 73, 80 (2d Cir.1994) (*citing Curiano v. Suozzi*, 63 N.Y.2d 113, 480 N.Y.S.2d 466, 468, 469 N.E.2d 1324, 1326 (1984)). Carter argues

---

*Albright*, 510 U.S. at 271–75, 114 S.Ct. at 812–14.

10. "Since this order is not one for exclusive occupancy of the premises, the order shall not otherwise effect [sic] the rights of the parties with respect to either premise." (*See* Def.Exh. H).

11. Plaintiff also claims two non-defendant police officers from the 13th Precinct failed to return a

videotape he had taken of the contents of the loft, which he and Pinkins had given them for safekeeping after a dispute arose between the couple over whether the tape violated the April 7th order. (*See* Brawer Dep. at 47, 55, 62–68). Plaintiff has alleged no facts linking the failure to return the tape to the alleged conspiracy, however, nor does he base any claims on this incident. (*See* Brawer Dep. at 69–70).

that summary judgment should be granted dismissing the abuse of process claim because there is no evidence that he arrested Brawer to obtain a collateral objective beyond the legitimate ends of process or that he misused process after plaintiff was arrested. I disagree.

It is true that "[t]he pursuit of a collateral objective must occur *after* the process is issued; the mere act of issuing process does not give rise to a claim." *Lopez v. City of New York,* 901 F.Supp. 684, 691 (S.D.N.Y. 1995) (footnote and citation omitted). Here, Brawer has alleged that Carter arrested him and charged him with criminal contempt and unlawful eviction to interfere with the custody dispute between Brawer and Pinkins as a means of gaining favor with Pinkins. Drawing all reasonable inferences in favor of plaintiff, there is sufficient evidence for a rational jury to conclude that Carter arrested and prosecuted Brawer to obtain a collateral objective beyond the legitimate ends of process—namely, the objective of currying favor with Pinkins. The evidence shows that Carter arrested Brawer without a warrant, at Brawer's place of work, five days after Carter knew that Pinkins had regained access to the loft. In addition, Carter had accompanied Pinkins to the loft to change the locks, and drove her to her place of work, where she introduced him to actors and other people involved in her soap opera. Finally, plaintiff has shown that the arrest interfered with his person, because he was held in prison overnight. The motion for summary judgment dismissing the abuse of process claim is denied.

### 9. *Qualified Immunity*

 The police officer defendants argue that all of the claims against them should be dismissed under the doctrine of qualified immunity. "The doctrine of qualified immunity shields government employees acting in their official capacity from suits for damages under 42 U.S.C. § 1983, unless their conduct violated clearly established rights of which an objectively reasonable official would have known." *Lowth,* 82 F.3d at 568–69 (*citing Harlow v. Fitzgerald,* 457 U.S. 800, 818, 102 S.Ct. 2727, 2738, 73 L.Ed.2d 396 (1982)).

The right to be free from false arrest is clearly established. *See Lennon v. Miller,* 66 F.3d 416, 423 (2d Cir.1995). Even where the rights were clearly established, a police officer will be accorded qualified immunity if, based on the facts known to the officer, it was objectively reasonable for the officer to believe that his or her actions did not violate plaintiff's clearly established constitutional rights. *See id.* (arresting officer entitled to qualified immunity where "either (a) it was objectively reasonable for the officer to believe that probable cause existed, or (b) officers of reasonable competence could disagree on whether the probable cause test was met.") (citation omitted).

Because the parties do not agree on the facts known to the officers who conducted the June 26th and the July 20th arrests and the circumstances surrounding those arrests, however, summary judgment is not appropriate. *See Kaminsky v. Rosenblum,* 929 F.2d 922, 927 (2d Cir.1991) (where objective reasonableness of officers' action depends upon disputed facts, district court properly denied summary judgment); *cf. Warren v. Dwyer,* 906 F.2d 70, 76 (2d Cir.), *cert. denied,* 498 U.S. 967, 111 S.Ct. 431, 112 L.Ed.2d 414 (1990) (qualified immunity should be decided by court as matter of law when facts are undisputed).

With respect to the June 26th arrest, plaintiff and the arresting officers disagree as to his willingness to leave the loft. Given Brawer's testimony that he was willing to leave the loft, I cannot say that as a matter of law it was objectively reasonable for the officers to arrest Brawer. Likewise, based on the record before me, a reasonable jury could conclude that it was not objectively reasonable for Detectives Carter and DelGrosso to arrest Brawer at his place of business after they knew that Pinkins had gained entry to the loft. Accordingly, defendants' motion for summary judgment based on a qualified immunity defense is denied.

### CONCLUSION

For the reasons set forth above, the motion for summary judgment is granted in full in favor of defendants Bailey, DeJesus, Rivera, and Reina for lack of personal involve-

ment. Counts 5 and 10 are dismissed with respect to Detective Warren for lack of personal involvement. The City's motion for summary judgment dismissing count 11 is granted. The motion for summary judgment dismissing counts 1, 3, 7, 9, and 12 is denied. The motion for summary judgment dismissing the malicious prosecution claims contained in counts 2, 5, 8, and 10 is granted, as is the motion for summary judgment with respect to the illegal search and seizure claim contained in count 4. The motion for summary judgment with respect to count 6 is denied as to defendants Warren and Carter and granted with respect to the other defendants. Finally, the motion for summary judgment dismissing count 13, the abuse of process claim, is denied. Thus, counts 1, 3, 6, 7, 9, 12, and 13 remain to be tried, to the extent set forth above.

SO ORDERED.