Monica HUJAZI, Petitioner,

v.

**SUPERIOR COURT OF CALIFORNIA,**
County of Los Angeles,
Respondent.

No. CV 11–1555–ODW(E).

United States District Court,
C.D. California.

June 7, 2012.

---

Michael Edward Grodsky, Michael Grodsky Law Offices, Los Angeles, CA, Steven T. Flowers, Steven T. Flowers Law Offices, Beverly Hills, CA, for Petitioner.

Rick Vincent Curcio, LA City Atty. Ofc., Los Angeles, CA, for Respondent.

## REPORT AND RECOMMENDATION OF UNITED STATES MAGISTRATE JUDGE

CHARLES F. EICK, United States Magistrate Judge.

This Report and Recommendation is submitted to the Honorable Otis D. Wright II, United States District Judge, pursuant to 28 U.S.C. section 636 and General Order 05–07 of the United States District Court for the Central District of California.

## PROCEEDINGS

Petitioner filed a "Petition for Writ of Habeas Corpus By a Person in State Custody" on February 22, 2011. The Petition asserted that: (1) the trial court denied Petitioner the right to put on a defense by allegedly finding that the subject offenses are "strict liability" offenses under California law (Ground One); and (2) Petitioner's trial counsel allegedly rendered ineffective assistance (Ground Two). On May 23, 2011, Respondent filed an Answer and a Memorandum of Points and Authorities in support thereof, asserting, *inter alia*, that Ground Two is unexhausted. On August 16, 2011, Petitioner filed a "Notice of Withdrawal of Cause of Action," which withdrew Ground Two. Petitioner filed a Reply on September 13, 2011.

In accordance with the Court's September 15, 2011 Order, Respondent filed a Supplemental Answer on January 31, 2012. Petitioner filed a Supplemental Reply on May 16, 2012.

## BACKGROUND

On May 29, 2008, a Los Angeles County Superior Court jury found Petitioner guilty of 39 counts of violating Los Angeles Municipal and County Building, Fire, and Health and Safety Codes regarding her maintenance of the apartment building located at 621 South Union Avenue (Reporter's Transcript ["R.T."], pp. 405, 479–84, 489).[1] The trial court suspended Petitioner's sentence and placed Petitioner on 36 months of summary probation with conditions, *inter alia*, that Petitioner serve 30 days in jail, perform 300 hours of community service, and pay a fine (R.T. 699–701).

On November 6, 2009, the Los Angeles County Superior Court Appellate Division affirmed the judgment in a reasoned decision (Respondent's Lodgment 7). On November 25, 2009, the Appellate Division summarily denied Petitioner's "Petition for Rehearing and for Transfer to the Court of Appeal" (Respondent's Lodgments 8–9).

---

1. The jury found Petitioner not guilty on 12 charged counts (R.T. 480–83). The counts on which the jury found Petitioner guilty charged, *inter alia*: (1) failure to provide smoke detectors; (2) failure to maintain walls and ceilings, floors, flooring, windows, doors, plumbing, electrical, fire safety doors, insect screens, guard rails, bathtubs, sinks, cabinets, stair treads, exit signs, and a stairway identification numbering system; (3) failure to abate mold and mildew; (4) failure to provide an operational elevator; (5) failure to maintain at least one hour fire occupancy separation; (6) maintaining an unpermitted laundry area; (7) maintaining ABS piping in a building over two stories in height; (8) maintaining a sleeping room lacking an emergency escape door and window; (9) failure to keep the premises free from infestation by insects, vermin and/or rodents, and permitting occupancy where the condition of the building permitted breeding and harborage of rodents, fleas, bedbugs, cockroaches, lice, mosquitos, and other vermin; (10) failure to maintain the premises free from accumulation of waste; and (11) failure to identify fire department inlet connections. *See* Respondent's Lodgment 2, Document 4 (Amended Misdemeanor Complaint); R.T. 479–83 (verdicts); *see also* Respondent's Lodgment 7 at 3 n. 1 (detailing convictions).

Petitioner filed a "Petition for Writ of Prohibition/Mandate" in the California Court of Appeal, which the Court of Appeal summarily denied on December 29, 2009 (Respondent's Lodgments 11–12). Petitioner filed a "Petition for Writ of Review (Certiorari)" in the California Supreme Court, which that court summarily denied on February 10, 2010 (Respondent's Lodgments 13–14). Petitioner petitioned for a writ of certiorari to the United States Supreme Court, which that court summarily denied on May 3, 2010 (Respondent's Lodgments 15–16).

Thereafter, Petitioner filed habeas corpus petitions in the Los Angeles County Superior Court and California Court of Appeal, and a petition for review in the California Supreme Court, each alleging ineffective assistance of trial counsel (Respondent's Lodgments 17–18, 20, 22, 24). The state courts denied all of these petitions (Respondent's Lodgments 19, 21, 23, 25).

### SUMMARY OF TRIAL EVIDENCE

The following factual summary is taken from the opinion of the Los Angeles County Superior Court Appellate Division in *People v. Hujazi* (Respondent's Lodgment 7). *See Galvan v. Alaska Dep't of Corrections,* 397 F.3d 1198, 1199 & n. 1 (9th Cir.2005) (taking factual summary from Court of Appeal opinion).

> [Petitioner] owned, operated, and controlled a 68–unit residential apartment building located at 621 S. Union Avenue in Los Angeles. Initially, [Petitioner] was charged with over 100 violations of the law.... The causes proceeded to trial on 51 counts that alleged various building, fire, electrical, plumbing and health violations on dates falling within the time period from June 19, 2007, through August 22, 2007.
>
> \* \* \*

The prosecution's case consisted of the testimony of Brian Beltran, an inspector for the Los Angeles Housing Department, Calvin Morris, an inspector for the Los Angeles County Health Department, and Andrew Gutierrez, an inspector for the Los Angeles County Fire Department. All inspectors were members of the Interagency Task Force that focused on substandard buildings. Each inspector testified regarding the various violations found during his respective inspection of the building on various dates within the time periods alleged in the complaint. The charges were based upon violations discovered during one inspection and not corrected by a later inspection, and upon new violations found during a subsequent inspection.

(Respondent's Lodgment 7, pp. 1–2).

### STANDARD OF REVIEW

 Under the "Antiterrorism and Effective Death Penalty Act of 1996" ("AEDPA"), a federal court may not grant an application for writ of habeas corpus on behalf of a person in state custody with respect to any claim that was adjudicated on the merits in state court proceedings unless the adjudication of the claim: (1) "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States"; or (2) "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d); *Woodford v. Visciotti,* 537 U.S. 19, 24–26, 123 S.Ct. 357, 154 L.Ed.2d 279 (2002); *Early v. Packer,* 537 U.S. 3, 8, 123 S.Ct. 362, 154 L.Ed.2d 263 (2002); *Williams v. Taylor,* 529 U.S. 362, 405–09, 120 S.Ct. 1495, 146 L.Ed.2d 389 (2000). This standard of review is "highly deferential" and "difficult

to meet." *Harrington v. Richter*, —— U.S. ——, 131 S.Ct. 770, 786, 178 L.Ed.2d 624 (2011); *Woodford v. Visciotti*, 537 U.S. at 24, 123 S.Ct. 357. "The petitioner carries the burden of proof." *Cullen v. Pinholster*, —— U.S. ——, 131 S.Ct. 1388, 1398, 179 L.Ed.2d 557 (2011).

■ "Clearly established Federal law" refers to the governing legal principle or principles set forth by the Supreme Court at the time the state court renders its decision. *Lockyer v. Andrade*, 538 U.S. 63, 123 S.Ct. 1166, 155 L.Ed.2d 144 (2003). A state court's decision is "contrary to" clearly established Federal law if: (1) it applies a rule that contradicts governing Supreme Court law; or (2) it "confronts a set of facts … materially indistinguishable" from a decision of the Supreme Court but reaches a different result. *See Early v. Packer*, 537 U.S. at 8, 123 S.Ct. 362 (citation omitted); *Williams v. Taylor*, 529 U.S. at 405–06, 120 S.Ct. 1495.

■ Under the "unreasonable application prong" of section 2254(d)(1), a federal court may grant habeas relief "based on the application of a governing legal principle to a set of facts different from those of the case in which the principle was announced." *Lockyer v. Andrade*, 538 U.S. at 76, 123 S.Ct. 1166 (citation omitted); *see also Woodford v. Visciotti*, 537 U.S. at 24–26, 123 S.Ct. 357 (state court decision "involves an unreasonable application" of clearly established federal law if it identifies the correct governing Supreme Court law but unreasonably applies the law to the facts). A state court's decision "involves an unreasonable application of [Supreme Court] precedent if the state court either unreasonably extends a legal principle from [Supreme Court] precedent to a new context where it should not apply, or unreasonably refuses to extend that principle to a new context where it should apply." *Williams v. Taylor*, 529 U.S. at 407, 120 S.Ct. 1495 (citation omitted).

■ "In order for a federal court to find a state court's application of [Supreme Court] precedent 'unreasonable,' the state court's decision must have been more than incorrect or erroneous." *Wiggins v. Smith*, 539 U.S. 510, 520, 123 S.Ct. 2527, 156 L.Ed.2d 471 (2003) (citation omitted). "The state court's application must have been 'objectively unreasonable.'" *Id.* at 520–21, 123 S.Ct. 2527 (citation omitted); *see also Waddington v. Sarausad*, 555 U.S. 179, 190, 129 S.Ct. 823, 172 L.Ed.2d 532 (2009); *Davis v. Woodford*, 384 F.3d 628, 637–38 (9th Cir.2004), *cert. dism'd*, 545 U.S. 1165, 126 S.Ct. 410, 162 L.Ed.2d 933 (2005). "Under § 2254(d), a habeas court must determine what arguments or theories supported, … or could have supported, the state court's decision; and then it must ask whether it is possible fairminded jurists could disagree that those arguments or theories are inconsistent with the holding in a prior decision of this Court." *Harrington v. Richter*, 131 S.Ct. at 786. This is "the only question that matters under § 2254(d)(1)." *Id.* (citation and internal quotations omitted). Habeas relief may not issue unless "there is no possibility fairminded jurists could disagree that the state court's decision conflicts with [the United States Supreme Court's] precedents." *Id.* at 786–87 ("As a condition for obtaining habeas corpus from a federal court, a state prisoner must show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement.").

■ In applying these standards, the Court looks to the last reasoned state court decision. *See DeWeaver v. Runnels*, 556 F.3d 995, 997 (9th Cir.), *cert. de-*

*nied,* —— U.S. ——, 130 S.Ct. 183, 175 L.Ed.2d 115 (2009). Here, the last reasoned state court decision addressing the merits of Ground One is the Appellate Division decision on direct appeal. (Respondent's Lodgment 7).

## DISCUSSION

### I. *Petitioner's Claim that the Trial Court Denied Her the Right to Put on a Defense Does Not Merit Habeas Relief.*

Petitioner claims that the trial court denied her the right to put on a defense by ruling that the charged offenses were "strict liability" offenses under California law (Petition, Ground One; Reply, p. 2). Specifically, Petitioner argues that the trial court prevented her from attempting to prove that her tenants had caused the subject conditions at the property, either by destroying the property or by destroying Petitioner's repairs to the property (Reply, p. 2). As discussed below, Petitioner's argument does not merit habeas relief.

### A. *The Trial Court's Rulings*

Prior to the start of trial, the trial court addressed with counsel whether the jury instructions would include the word "willful" (R.T. 27–30). The prosecution argued under *People v. Bachrach,* 114 Cal.App.3d Supp. 8, 170 Cal.Rptr. 773 (Cal.App.Super.1980) (*"Bachrach"*), that the court should delete any willfulness language from the instructions because the offenses assertedly were strict liability offenses (R.T. 28–30).[2] Petitioner's counsel argued that such a ruling would prevent Petitioner from presenting her case to the jury and essentially would direct a verdict (R.T. 38, 40–41).

---

**2.** In *Bachrach,* a defendant landlord had been convicted of Los Angeles Municipal Code public safety and fire prevention violations for failure to provide exit signs, failure to secure a vacant building, failure to provide a garbage bin with heat activated closing devices, maintaining an antenna less than seven feet high on an accessible roof, failure to maintain a fire door, failure to correct hazardous conditions after notice, and failure to have a wet standpipe system tested within a five-year period. *Bachrach,* 114 Cal.App.3d Supp. at 12 n. 2, 170 Cal.Rptr. at 775 n. 2. In affirming the conviction, the Los Angeles County Superior Court Appellate Department found that the violations were strict liability offenses, designed to protect the safety of tenants. The *Bachrach* court explained:

> The [trial] court correctly instructed the jury that intent was not an element of any of the offenses with which the defendant was charged. These offenses being, as they are, against the public health and safety and against the public welfare, do not require proof of intent nor criminal negligence, but are governed by rules of "strict liability." The rationale given for imposing strict liability to the proscribed acts include the following: Statutes of this nature are primarily concerned with the protection of the public and not with the punishment and correction of offenders.

> \* \* \*

> Whether a legislative body intended the doctrine of strict liability to apply to a given statute is determined by the subject matter, the language, the evil sought to be prevented by the enactment of the statute. From the subject matter, the language, and the purpose of the laws which the jury found the defendant violated, the legislative intent in their enactment is clear. These laws were adopted to protect the lives and property of persons in crowded apartments. While these laws impose obligations upon apartment house owners such as the defendant "[he] ... is in a position to prevent [the violations] with no more care than society might reasonably expect and no more exertion than it might reasonably exact from one who assumed his responsibilities."

*Bachrach,* 114 Cal.App.3d Supp. at 12–13, 170 Cal.Rptr. at 775–76 (internal footnote and citations omitted; quoting *Morissette v. United States,* 342 U.S. 246, 256, 72 S.Ct. 240, 96 L.Ed. 288 (1952)).

The trial court found that Petitioner's case, like *Bachrach*, involved the "type of regulatory and public health-and-safety-type ordinances" that define strict liability offenses (R.T. 36, 41). The court observed that the subject codes make no mention of any willfulness or knowledge elements. *Id.*[3] The trial court therefore removed all intent or knowledge elements from the jury instructions (R.T. 41–42; *see also* R.T. 48 ("the issue in this case is really just going to be whether or not a condition existed, regardless of the defendant's intent, motive"); R.T. 97 (trial court instructing the jury that intent or other mental state need not be proven)). The trial court stated that the strict liability nature of the offenses would not prevent the defense from putting on a defense, but would "just change[ ] the nature of the defense." *See* R.T. 41 (stating that Petitioner remained "free to attack the factual allegations of whether or not any of these charges occurred").

Petitioner's counsel proffered that Petitioner would be presenting an objective impossibility defense under *United States v. Park*, 421 U.S. 658, 95 S.Ct. 1903, 44 L.Ed.2d 489 (1975) (discussed *infra* ), *i.e.,* that her tenants assertedly prevented her from making the appropriate repairs to the property.[4] The trial court reserved ruling on the viability of such a defense until after presentation of the prosecution's case (R.T. 44–45).

During the presentation of the prosecution's case, Petitioner's counsel questioned the inspector witnesses in a manner suggesting that the inspectors did not know whether the tenants intentionally destroyed or damaged the property inspected, or whether the tenants otherwise were responsible for the code violations. *See* R.T. 202–05, 237–39. The prosecution objected to the causation evidence and, after lengthy argument (*see* R.T. 239–48), the trial court ruled that testimony concerning the cause of the violations was not relevant, given the strict liability nature of the offenses (R.T. 248–50).

When the jury returned, the trial court instructed:

> [I]f you recall, yesterday we shut things down during cross-examination by [Petitioner's counsel] during questions such as, did Mr. Beltran make any

---

**3.** This Court's review of the applicable Los Angeles County Code and Los Angeles Municipal Code sections available online at http://search.municode.com/html/16274/index.htm and http://www.amlegal.com/nxt/gateway.dll?f=templates&fn=default.htm&vid=amlegal:lamc_ca (last visited Jan. 12, 2012), respectively, confirms the trial court's observation. There is no suggestion in these codes that conviction of a misdemeanor for violating the codes requires that the violation have been willful. *See, e.g.,* Los Angeles County Code § 1.24.010 (defining violations as misdemeanors); Los Angeles Municipal Code § 57.20.41(E) (providing punishment for violating the requirement for operational fire assembly doors); Los Angeles Municipal Code § 57.33.15(F) (same for failing to provide proper exit signs).

**4.** Counsel explained:

> What we're talking about ... would be when tenants refuse not only the carpet individuals to come in and lay new carpet, but the tenants also, within a week, destroyed the new carpet. In addition to that, there will be testimony that new screens were put up on many occasions and within a day or two, and no more than a week, they were either ripped, torn out or discarded.

(R.T. 42–43). When asked how the tenant behavior would relate to an objective impossibility defense, Petitioner's counsel explained: "[O]nce you put it in, the tenants then take it out.... [W]hen you have the carpet people being refused access, when you have the exterminators being refused access, and we'll have testimony from several exterminator companies that the tenants would not grant them permission to enter and spray." (R.T. 43).

determination as to the cleanliness of particular units and how many people were living in units and so forth. And so what I want to explain to you is that the issue of causation has been—well, for these types of allegations in this case, the issue of causation is not relevant as to what caused the condition.

So there are two elements to be proved: Number 1, that Ms. Hujazi is the responsible party for the property in question; and, Number 2, whether or not the condition existed. So whether or not the condition was caused by a third party or tenant is not relevant. So, at this time, the questions and answers that you did hear before we started discussing this yesterday are stricken from the record.

(R.T. 254–55).[5]

Prior to the start of the defense case, Petitioner's counsel requested confirmation that the trial court would not be permitting the defense to argue that tenants caused the damage to the building (R.T. 354–55). The trial court responded that a causation defense (which would not be allowed) was different from an objective impossibility defense predicated on an inability to cure the violations because of tenant conduct. According to the court, such an impossibility defense would require something "closer to [Petitioner's] utter powerlessness to prevent the condition" (R.T. 391–93). When the court requested an offer of proof on the intended defense, Petitioner's counsel proffered that managers and contractors would testify that tenants were destroying property that Petitioner was trying to repair (R.T. 393–94). The trial court ruled that Petitioner had not proffered substantial evidence of her own powerlessness sufficient to support an impossibility defense (R.T. 395, 409).[6] The defense then rested (R.T. 395).

## B. *The State Court Decision on Appeal*

On direct appeal, Petitioner challenged the trial court's finding that the offenses were strict liability offenses and the court's asserted preclusion of Petitioner's alleged impossibility defense. *See* Respondent's Lodgment 4, pp. 8–18; Respondent's Lodgment 6. The Los Angeles County Superior Court Appellate Division rejected these challenges (Respondent's Lodgment 7, pp. 4–11). The Appellate Division found that the trial court committed no error in concluding that the offenses were strict liability offenses under California law. (*Id.* at 4–7). The Appellate Division also found no violation of Petitioner's right to

---

**5.** Consistent with Petitioner's proffered defense, Petitioner's counsel continued cross-examination by asking the inspector if items he observed on reinspection were new but had been damaged (R.T. 259–60). Counsel also cross-examined the inspector concerning whether tenant cooperation was necessary to accomplish adequate pest control (R.T. 345–47).

**6.** The trial court stated:

I understand that the building ... was a difficult building with difficult tenants. But I don't think there's any apartment building out there that does not have difficult tenants. And I don't think it's ever easy to run an apartment building or own an apartment building. But the fact remains that it is the responsibility of the owner to bring the property into compliance. And whether that is difficult or even impossible due to actions of the tenants is really no matter. And it's incumbent upon the owner to deal with those tenants and take actions that are necessary to bring the property into compliance and comply with the law.... *I don't find that there is any evidence before me that any efforts were taken to either evict the problem tenants ... or, at the very least, issue them letters indicating that their apartments would be entered and work would be done.*

(R.T. 698–99) (emphasis added).

present a defense, reasoning that Petitioner's proffered evidence did not constitute substantial evidence that Petitioner did all that was objectively possible to "discover, prevent and remedy" the violations (Respondent's Lodgment 7 at 9–11). Because Petitioner's evidence was inadequate as a matter of law, the Appellate Division ruled the trial court's exclusion of the evidence as irrelevant did not implicate Petitioner's constitutional rights (Respondent's Lodgment 7 at 10–11).

### C. *Analysis*

■ As previously stated, this Court may grant the Petition only if the state court adjudication (1) resulted in a decision that was "contrary to," or involved an "unreasonable application of, clearly established federal law as determined by the Supreme Court"; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented to the state court. *See* 28 U.S.C. § 2254(d); *see also Harrington v. Richter*, —— U.S. ——, 131 S.Ct. 770, 786, 178 L.Ed.2d 624 (2011). Thus, to the extent Petitioner may be claiming that the trial court rulings violated California law, Petitioner is not entitled to habeas relief. *See Wilson v. Corcoran*, —— U.S. ——, 131 S.Ct. 13, 16, 178 L.Ed.2d 276 (2010) ("it is only noncompliance with *federal* law that renders a State's criminal judgment susceptible to collateral attack in the federal courts") (original emphasis); *Estelle v. McGuire*, 502 U.S. 62, 67–68, 112 S.Ct. 475, 116 L.Ed.2d 385 (1991) (mere errors in the application of state law are not cognizable on federal habeas review). The Appellate Division found that the trial court did not err in finding that the charged crimes were strict liability crimes and in instructing the jury accordingly (Respondent's Lodgment 7, pp. 4–11). It is not for this Court to reexamine the state court's determination on this state law is-

sue. *See Waddington v. Sarausad*, 555 U.S. 179, 192 n. 5, 129 S.Ct. 823, 172 L.Ed.2d 532 (2009) ("we have repeatedly held that it is not the province of a federal habeas court to reexamine state-court determinations on state-law questions") (citation and internal quotations omitted); *Bradshaw v. Richey*, 546 U.S. 74, 76, 126 S.Ct. 602, 163 L.Ed.2d 407 (2005) ("a state court's interpretation of state law, including one announced on direct appeal of the challenged conviction, binds a federal court sitting in habeas corpus"); *see also Holgerson v. Knowles*, 309 F.3d 1200, 1202 (9th Cir.2002), *cert. denied*, 538 U.S. 1005, 123 S.Ct. 1915, 155 L.Ed.2d 837 (2003) (federal habeas court "bound by California's interpretation of its state law") (citation omitted); *Garrison v. Trombley*, 2009 WL 311102, at *9 (E.D.Mich. Feb. 9, 2009) (federal habeas court bound by state court's interpretation of state law as imposing "strict criminal liability").

■ To the extent Petitioner may claim that the trial court's rulings violated federal law, Petitioner also is not entitled to habeas relief. Petitioner has cited no clearly established United States Supreme Court decisional law, and this Court has found none, determining the *per se* unconstitutionality of strict liability offenses *or* the unconstitutionality of strict liability offenses like the ones here involved. To the contrary, in *Morissette v. United States*, 342 U.S. 246, 255, 72 S.Ct. 240, 96 L.Ed. 288 (1952) (*"Morissette"*), the Supreme Court recognized that strict liability often is imposed for "public welfare offenses," *i.e.*, offenses that are "in nature of neglect where the law requires care, or inaction where it imposes a duty." *Id.* As the Ninth Circuit has explained:

> The [*Morissette*] Court developed the exception for public welfare offense from the statutory presumption of *mens rea* because of hazards arising out of the

Industrial Revolution, which created "dangers [that] have engendered increasingly numerous and detailed regulations which heighten the duties of those in control of particular industries, trades, *properties* or activities that affect public health, safety or welfare."

*Humanitarian Law Project v. U.S. Dept. of Justice*, 352 F.3d 382, 402 n. 14 (9th Cir.2003), *vacated on other grounds by*, 393 F.3d 902 (9th Cir.2004) (quoting *Morissette*, 342 U.S. at 254, 72 S.Ct. 240; emphasis added).

The fact that lawmakers have "sought to make such regulations more effective by invoking criminal sanctions to be applied by the familiar technique of criminal prosecutions and convictions" has not rendered these regulations unconstitutional. *Morissette*, 342 U.S. at 254–60, 72 S.Ct. 240 (discussing with approval state regulatory cases that have abandoned the "ingredient of intent," but conceding that no precise criteria have been set forth for distinguishing between crimes that require a "mental element" and crimes that do not); *Staples v. United States*, 511 U.S. 600, 607 n. 3, 114 S.Ct. 1793, 128 L.Ed.2d 608 (1994) ("[W]e have referred to public welfare offenses as 'dispensing with' or 'eliminating' a *mens rea* requirement or 'mental element' and have described them as strict liability crimes. While use of the term 'strict liability' is really a misnomer, we have interpreted statutes defining public welfare offenses to eliminate the requirement of *mens rea*; that is, the requirement of a 'guilty mind' with respect to an element of the crime. Under such statutes we have not required that the defendant know the facts that make his conduct fit the definition of the offense.") (citing, *inter alia*, *Morissette*, 342 U.S. at 250, 263, 72 S.Ct. 240); *see also United States v. Dotterweich*, 320 U.S. 277, 280–81, 64 S.Ct. 134, 88 L.Ed. 48 (1943) (such legislation acts "in the interest of the larger good [by putting] the burden of acting at hazard upon a person otherwise innocent but standing in responsible relation to a public danger"); *United States v. Hanousek*, 176 F.3d 1116, 1121 (9th Cir.1999), *cert. denied*, 528 U.S. 1102, 120 S.Ct. 860, 145 L.Ed.2d 710 (2000) ("It is well established that a public welfare statute may subject a person to criminal liability for his or her ordinary negligence without violating due process.") (citations omitted); *People v. Vurckio*, 162 Misc.2d 876, 880, 619 N.Y.S.2d 510, 512 (N.Y.City Crim.Ct.1994) ("Since the turn of the [20th] century, state courts have discontinued inquiry into 'intent' in a limited class of offenses, such as labor law and building code violations.").[7]

---

**7.** Petitioner argues that the Supreme Court has "severely narrowed" *Morissette*, citing *Smith v. California*, 361 U.S. 147, 80 S.Ct. 215, 4 L.Ed.2d 205 (1959) (*"Smith"*) and *Carella v. California*, 491 U.S. 263, 109 S.Ct. 2419, 105 L.Ed.2d 218 (1989) (*"Carella"*) (Petition, Ground One; Reply, p. 3; Supplemental Reply, p. 3). Petitioner's argument is unpersuasive. In *Smith*, the Supreme Court struck down as unconstitutional a Los Angeles Municipal Code provision imposing strict liability on a bookseller possessing obscene material, finding that the ordinance's failure to require any knowledge on the part of the bookseller would impose a "severe limitation" on the public's access to constitutional-

ly-protected expression. *Smith*, 361 U.S. at 153–55, 80 S.Ct. 215. *Smith* did not undermine the rationale of *Morissette* that strict liability is permissible for public welfare offenses that concern public health, safety or welfare without implicating freedom of expression. *See Smith*, 361 U.S. at 153, 80 S.Ct. 215 (contrasting the unconstitutional booksellers ordinance with food and drug legislation which involves a public interest "so great" as to "warrant the imposition of the highest standard of care on distributors").

The *Carella* decision is even more inapposite than *Smith*. In *Carella*, the Supreme Court found unconstitutional "mandatory" jury instructions that "directly foreclosed in-

There is no clearly established Supreme Court law defining the precise criteria courts should employ in determining which crimes constitutionally require a mental element and which crimes do not. *See Morissette,* 342 U.S. at 260, 72 S.Ct. 240; *see also Powell v. State of Texas,* 392 U.S. 514, 535, 88 S.Ct. 2145, 20 L.Ed.2d 1254

(1968) ("this Court has never articulated a general constitutional doctrine of mens rea"). Because of this lack of clarity, and the case law permitting strict liability under similar public welfare regulations, the state courts were not unreasonable in rejecting Petitioner's constitutional claims.[8] Thus, habeas relief is unavailable. *See* 28

dependent jury consideration of whether the facts proved established certain elements of the [charged] offenses." *Carella,* 491 U.S. at 266, 109 S.Ct. 2419. The instructions provided that intent to commit theft by fraud is presumed in certain circumstances, when such intent was a specific element of the charged crime. *Id.* at 264, 109 S.Ct. 2419. Here, unlike in *Carella,* the trial court found that intent was *not* an element of the charged offenses. *Carella* does not invalidate strict liability offenses or otherwise undermine *Morissette.*

8. Buttressing this conclusion are Supreme Court pronouncements underscoring the importance to the public welfare of code provisions such as those involved in the present case. In *Morissette,* the Supreme Court noted that "[c]ongestion in cities and crowding of quarters called for health and welfare regulations undreamed of in simpler times." *Morissette,* 342 U.S. at 254, 72 S.Ct. 240. In *Frank v. State of Md.,* 359 U.S. 360, 371–72, 79 S.Ct. 804, 3 L.Ed.2d 877 (1959) (overruled on other grounds by *Camara v. Municipal Court of City and County of San Francisco,* 387 U.S. 523, 87 S.Ct. 1727, 18 L.Ed.2d 930 (1967)), which upheld warrantless inspections of dwellings for enforcement of city health codes, the Supreme Court stated:

> The need to maintain basic, minimal standards of housing, to prevent the spread of disease and of that pervasive breakdown in the fiber of a people which is produced by slums and the absence of the barest essentials of civilized living, has mounted to a major concern of American government. The growth of cities, the crowding of populations, the increased awareness of the responsibility of the state for the living conditions of its citizens, all have combined to create problems of the enforcement of minimum standards.... Time and experience have forcefully taught that the power to inspect dwelling places ... is of indispens-

able importance to the maintenance of community health....

Petitioner's citations of *United States v. Park,* 421 U.S. 658, 95 S.Ct. 1903, 44 L.Ed.2d 489 (1975) *("Park")* and *Staples v. United States,* 511 U.S. 600, 114 S.Ct. 1793, 128 L.Ed.2d 608 (1994) do not alter the Court's conclusion. Petitioner suggests that these cases clearly establish that whether a crime requires a mental element depends on whether the harm sought to be prevented is imminent or inherent (in which case no mental element would apply), or merely a possibility (in which case a mental element would apply). *See* Supplemental Reply, pp. 4–5. The cited cases establish no such principle. The *Park* case, discussed further *infra,* concerned whether the manager of a corporation and the corporation itself could be held strictly liable for Federal Food, Drug and Cosmetic Act violations. The *Park* Court stated that the regulations at issue dispensed with the conventional requirement for awareness of some wrongdoing because the regulations "touch phases of the lives and health of people which, in the circumstances of modern industrialism, are largely beyond self-protection." *See Park,* 421 U.S. at 668, 95 S.Ct. 1903 (quoting *United States v. Dotterweich,* 320 U.S. at 280, 64 S.Ct. 134). The *Park* Court said nothing about imminence or inherence of harm being a touchstone with respect to the absence or presence of a mental element requirement. In *Staples v. United States,* the Supreme Court expressly declined to establish any rule regarding when crimes may or must require a mental element. *See Staples v. United States,* 511 U.S. at 619–20, 114 S.Ct. 1793 ("As we noted in *Morissette:* 'Neither this Court nor, so far as we are aware, any other has undertaken to delineate a precise line or set forth comprehensive criteria for distinguishing between crimes that require a mental element and crimes that do not.' We attempt no definition here, either.") (internal citation omitted).

U.S.C. § 2254(d); *Feliciano v. McNeil,* 2009 WL 1971635, at *15 (N.D.Fla. July 6, 2009) ("Given the lack of clearly established Supreme Court precedent on the criteria for determining when criminal intent is required and when it is not, this court cannot say that the state court's denial of relief on this claim is contrary to clearly established federal law"; habeas relief denied to petitioner who had been convicted of statutory rape without fault and sentenced to more than seven years in prison); *see also Tart v. Commonwealth of Massachusetts,* 949 F.2d 490, 503 (1st Cir. 1991) (rejecting constitutional challenge to criminal statute imposing strict liability for landing raw fish without a commercial fishing permit).

 Petitioner's assertion that trial court rulings deprived her of the right to present a defense is similarly unavailing. "Whether rooted directly in the Due Process Clause of the Fourteenth Amendment, or in the Compulsory Process or Confrontation clauses of the Sixth Amendment, the Constitution guarantees criminal defendants a meaningful opportunity to present a complete defense." *Holmes v. South Carolina,* 547 U.S. 319, 324, 126 S.Ct. 1727, 164 L.Ed.2d 503 (2006) (citations and internal quotations omitted); *Chambers v. Mississippi,* 410 U.S. 284, 302, 93 S.Ct. 1038, 35 L.Ed.2d 297 (1973) (*"Chambers"*); *Chia v. Cambra,* 360 F.3d 997, 1003 (9th Cir.2004), *cert. denied,* 544 U.S. 919, 125 S.Ct. 1637, 161 L.Ed.2d 476 (2005) ("The Supreme Court has made it clear that the erroneous exclusion of critical, corroborative defense evidence may violate both the Fifth Amendment due process right to a fair trial and the Sixth Amendment right to present a defense.") (citations and internal quotations omitted). However, *"Chambers* ... does not stand for the proposition that the defendant is denied a fair opportunity to defend himself

whenever a state ... rule excludes favorable evidence." *United States v. Scheffer,* 523 U.S. 303, 316, 118 S.Ct. 1261, 140 L.Ed.2d 413 (1998).

 "While the Constitution ... prohibits the exclusion of defense evidence under rules that serve no legitimate purpose or that are disproportionate to the ends that they are asserted to promote, well-established rules of evidence permit trial judges to exclude evidence if its probative value is outweighed by certain other factors such as unfair prejudice, confusion of the issues, or potential to mislead the jury." *Holmes v. South Carolina,* 547 U.S. at 320, 126 S.Ct. 1727 (citations omitted); *see also Moses v. Payne,* 555 F.3d 742, 758 (9th Cir.2009). Thus, "the Constitution permits judges to exclude evidence that is repetitive ..., only marginally relevant or poses an undue risk of harassment, prejudice or confusion of the issues." *Holmes v. South Carolina,* 547 U.S. at 326–27, 126 S.Ct. 1727 (citations, internal brackets and quotations omitted).

Petitioner relied on dictum in *Park,* 421 U.S. at 676–77, 95 S.Ct. 1903, to argue that her alleged impossibility evidence was relevant to a viable defense. In *Park,* the Supreme Court held that the Federal Food, Drug and Cosmetic Act, 21 U.S.C. § 301(k), imposed on corporate agents not only the duty to seek out and remedy violations, but also the duty to implement measures to ensure that violations will not occur. *Park,* 421 U.S. at 673–74, 95 S.Ct. 1903. The Court observed that a requested instruction on "objective impossibility" or lack of "power or capacity" should be given if a defendant first presents sufficient evidence to put such a defense at issue. *See United States v. Y. Hata & Company, Ltd.,* 535 F.2d 508, 510–11 (9th Cir.1976), *cert. denied,* 429 U.S. 828, 97 S.Ct. 87, 50 L.Ed.2d 92 (1976) (*"Hata"*) (discussing same).

While *Park* suggests that responsible corporate agents may raise a defense of powerlessness to prevent or correct a violation, (citing *United States v. Wiesenfeld Warehouse Co.*, 376 U.S. 86, 91, 84 S.Ct. 559, 11 L.Ed.2d 536 (1964)), *Park* makes clear that there must be sufficient supporting evidence to do so. *Park*, 421 U.S. at 673, 677, 95 S.Ct. 1903. What is required is more than merely a showing that the responsible party did not cause a violation or that some efforts to remedy a violation were frustrated. *See United States v. Starr*, 535 F.2d 512, 515 (9th Cir.1976) (allegations that food violations were due to "natural phenomenon" of vermin fleeing a nearby plowed field to contaminate a warehouse, and subsequent sabotage of corrective efforts by a third party, did not negate the warehouser's duty of "foresight and diligence" to support an objective impossibility defense); *Hata*, 535 F.2d at 511 (assuming, *arguendo*, that *Park* impossibility defense is available to an individual, allegations that repair attempts were unsuccessful would not support impossibility defense).

■ In the present case, regardless of whether the tenants originally caused the violations or frustrated some of Petitioner's alleged efforts to remedy the violations, Petitioner's offer of proof fell far short of a sufficient showing that it had been impossible for Petitioner to correct the violations. Petitioner stipulated that she was the owner, manager or person in control of the property (R.T. 405). In this capacity, Petitioner was responsible for maintenance of the properties and for remedying the identified violations. "The accused, if [s]he does not will the violation, usually is in a position to prevent it with no more care than society might reasonably expect and no more exertion than it might reasonably exact from one who assumed [her] responsibilities." *Morissette*, 342 U.S. at 256, 72 S.Ct. 240. While Petitioner may have *claimed* that she was "powerless" to prevent or correct the violations, the Appellate Division reasonably concluded that Petitioner's offer of proof was inadequate to support such a claim:

> Although [Petitioner] blamed some of her tenants for the state of the building, her offer of proof did not include any unsuccessful efforts to take corrective [action] against the offending tenants. The premises were subject to rent control and, as such, the landlord was authorized to evict a tenant who damages either his/her unit, the unit's appurtenances, or the common areas of the building. (Los Angeles Municipal Code § 151.09.A.3). Under the facts of this case, in the absence of evidence that it was objectively impossible for [Petitioner] to take corrective action against the complained of tenants, her offer of proof was inadequate as a matter of law.

*See* Respondent's Lodgment 7 at 8–10. The Court agrees that Petitioner's offer of proof fell far short of the required showing of objective impossibility.[9] For the same

---

9. In her Supplemental Reply, Petitioner argues for the first time that the prosecution violated *Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963) (*"Brady"*) by allegedly suppressing evidence that Petitioner purportedly had been targeted by a law firm specializing in tenant rights (Supplemental Reply, pp. 1–2). Under *Brady*, the suppression by the prosecution of evidence favorable to an accused violates due process "where the evidence is material either to guilt

or to punishment...." *Id.* at 87, 83 S.Ct. 1194. Suppressed evidence is material under *Brady* if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different. *Kyles v. Whitley*, 514 U.S. 419, 433, 115 S.Ct. 1555, 131 L.Ed.2d 490 (1995).

Given the strict liability nature of the subject offenses, as discussed above, there plainly exists no reasonable probability that introduc-

reason, the exclusion of Petitioner's scant proffered evidence relevant to a purported objective impossibility defense had no "substantial and injurious effect or influence in determining the jury's verdict." *Brecht v. Abrahamson*, 507 U.S. 619, 637–38, 113 S.Ct. 1710, 123 L.Ed.2d 353 (1993) (federal habeas relief unavailable for trial-type errors that are not of "substantial and injurious effect"); *see Fry v. Pliler*, 551 U.S. 112, 127 S.Ct. 2321, 168 L.Ed.2d 16 (2007) (*Brecht* standard applies to federal habeas review of *Chambers* errors).

### RECOMMENDATION

For the all of the foregoing reasons, IT IS RECOMMENDED that the Court issue an Order: (1) accepting and adopting this Report and Recommendation; and (2) denying and dismissing the Petition with prejudice.

### ORDER ACCEPTING FINDINGS, CONCLUSIONS AND RECOMMENDATIONS OF UNITED STATES MAGISTRATE JUDGE

OTIS D. WRIGHT II, District Judge.

Pursuant to 28 U.S.C. section 636, the Court has reviewed the Petition, all of the records herein and the attached Report and Recommendation of United States Magistrate Judge. The Court accepts and adopts the Magistrate Judge's Report and Recommendation.

IT IS ORDERED that Judgment be entered denying and dismissing the Petition with prejudice.

IT IS FURTHER ORDERED that the Clerk serve copies of this Order, the Magistrate Judge's Report and Recommendation and the Judgment herein on counsel for Petitioner and for Respondent.

LET JUDGMENT BE ENTERED ACCORDINGLY.

### JUDGMENT

Pursuant to the Order Accepting Findings, Conclusions and Recommendations of United States Magistrate Judge,

IT IS ADJUDGED that the Petition is denied and dismissed with prejudice.

tion of the allegedly suppressed evidence would have altered the result of Petitioner's trial. Whether the defense theory should be characterized as "impossibility," "obstruction," or something else, the result of the trial doubtlessly would have remained the same even if the alleged suppression of evidence had not taken place. The obvious lack of merit of Petitioner's belated *Brady* claim obviates any need to analyze whether the claim is exhausted or unexhausted. *See Cassett v. Stewart*, 406 F.3d 614, 623–24 (9th Cir.2005), *cert. denied*, 546 U.S. 1172, 126 S.Ct. 1336, 164 L.Ed.2d 52 (2006) (habeas court may deny on the merits unexhausted claim that is not "colorable").